UNITED STATES of America,
Plaintiff-Appellee,

v.

Ray TAMARGO, Linda Gail Bowling
Scott and Angelo Cannata,
Defendants-Appellants.

No. 80–5049.

United States Court of Appeals,
Fifth Circuit.
Unit B

Feb. 17, 1981.

Walter M. Lopez, Jr., John R. Lawson, Jr., Tampa, Fla., for Ray Tamargo; Ray Tamargo, pro se.

Gerald R. Herms, Rhea F. Law, Tampa, Fla., for Linda Gail Bowling Scott; Linda Gail Bowling Scott, pro se.

Gregory, Cours, Paniello, Johnson, Hayes & Hoft, Paul B. Johnson, J. Michael Hayes, Tampa, Fla., for Angelo Cannata.

Gary L. Betz, U. S. Atty., Eleanore J. Hill, Asst. U. S. Atty., Tampa, Fla., Mervyn Hamburg, Joan M. Azrack, Attys., Crim. Div., Appellate Sec., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before TUTTLE, GODBOLD and HILL, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal from the conviction of the three appellants, each on several charges of violating the Federal Mail Fraud statute and for the misapplication of funds granted under the Comprehensive Employment and Training Act, in violation of 18 U.S.C. § 665(a). Appellant Bowling also appeals from her conviction on two counts of making false statements to a federal agency, in violation of 18 U.S.C. § 1001. The appellants were also charged with conspiracy to defraud the United States in violation of 18 U.S.C. § 371, but, the jury being unable to reach a unanimous verdict on that charge, the court declared a mistrial as to it.

The appellants present the following issues in their appeals here:

1. Whether the statute governing the misapplication of CETA funds, 18 U.S.C. 665, is constitutional.

2. Whether the evidence was sufficient to support the convictions of each of the appellants.

3. Whether the district court or the prosecutor improperly commented on appellant Bowling's failure to take the stand.

4. Whether the district court erroneously excluded a defense exhibit on hearsay grounds.

5. Whether the district court's instructions to the jury were erroneous.

## I. STATEMENT OF THE CASE

A careful study of the record reveals that there was evidence from which the jury could find beyond a reasonable doubt the following facts:

Prior to June 1975, one Eugene O'Steen owned a group of 11 bars in Tampa. In June he sold them to a company named Spigrin, Inc. Nine of these bars were what were known and identified by the witnesses as "black bars" which, according to all of the testimony, had the peculiar characteristic of not selling mixed drinks. Instead, they served a primarily black clientele on a "package store" basis. That is, they sold beer, wine, and liquor by the bottle or in packages from which the drinks could then be poured by the purchaser at tables or at the bar. Purchasers who wished to concoct their own mixed drinks could obtain the necessary bottled ingredients from an icebox, together with such ice as they wished to take. At the time of the purchase, appellant Tamargo, an attorney, was a shareholder, an officer, and the operating manager of Spigrin. The corporation had four other shareholders, one of whom was Cesar Rodriguez, with whom appellant Cannata, had a business relationship.[1] At this time Cannata was the executive director of the Hillsborough-Tampa Comprehensive Employment Program (TCEP) which held the contract with the CETA officials to administer the federal funds for the county of Hillsborough and city of Tampa.

---

1. This relationship was described by Cannata in various terms but it is clear that it dealt with the operation of a "black neighborhood" bar which Cannata testified differed from the "black bars" in that patrons could buy mixed drinks. The relationship was that Cannata guaranteed to pay Rodriguez $1500 per month, but kept all of the proceeds in excess of that amount. He ran the bar and was present on almost a daily basis, although others operated it for him.

At the time of the sale, O'Steen had a manager and several barmaids in each bar. Initially, he went through the operation with each new manager he hired so that the new employee would understand the sales and inventory system that was used. He would show the new employees how to work the cash register, how to check the cash register out, how to count the money, and how to keep the inventory. The operation of the bars was "fairly simple." He could go through the entire procedure with a new employee in a single day. The nine "black bars" used what was known as a "perpetual inventory" system by which the items sold were replaced. The tag listing the brand name was placed on each bottle. When the bottle was sold the tag was taken off and placed on a metal spindle next to the cash register, so that these would show at the end of the day how much of each item had been sold. The beer and mixer inventory was kept according to the number of cases sold. At the end of each day, the quantities sold were calculated according to the number of tags on the spindle and depletion of beer and chaser boxes. The sales for the day were then recorded on a preprinted inventory sheet; then the tags, cash register tapes and the inventory sheets were sent daily to the main office. From there the tags and inventory sheets were sent to the warehouse where the inventories were then replenished according to the amount sold the previous day.

Shortly after the sale, Cannata's office suggested to the head of the recruitment program, one Didier, that he should approach Spigrin as a potential employer under the TCEP plan. After a short delay in the production of a contract with Spigrin, Cannata inquired about it, but was told that Didier's staff had had a difficult time reaching Tamargo. Thereupon, Tamargo showed up in Cannata's office where Mrs. Belliveau, having charge of the contract, negotiated with Tamargo in Cannata's presence for the original CETA authorization. This authorization consisted of an agreement by TCEP to pay 50 percent of the salaries of the "trainees" with a specified training period (here six weeks) for the three categories of employees, bar managers, accounting clerks and carpenters.[2]

It was highly unusual for an employer contract to be prepared or negotiated in the executive director's office.[3]

At the time of the sale, O'Steen had used an employer named Ed Gilley to supervise the nine "black bars." Spigrin engaged Gilley to continue performing that same service. At about the time Gilley took over for Spigrin, Tamargo told him that the bars were not doing well financially and that they had to cut the payroll. He directed Gilley to fire most of the managers who had worked for O'Steen, and to replace them with managers hired through TCEP. Tamargo told Gilley that TCEP would be paying one-half the managers' salaries. He did not tell Gilley that the new employees were to be trained or that TCEP was a training program. He did not give Gilley any instructions for establishing supervision for the trainees. Thereafter, any applicant for employment was referred by Gilley to TCEP. They were then referred back to Spigrin as trainees. Gilley would brief the new employees on the bar operation and then leave them to begin work managing Spigrin bars by themselves, without any person being present either to supervise or train them. Gilley never trained anyone. Spigrin referred several of the persons who were employed as managers to TCEP and TCEP referred them back to Spigrin as trainees. When they were assigned as "bar

---

**2.** The written agreement was a negotiated contract between the recruiter and Spigrin. The funds were intended to defray the costs incurred by the employer in providing on-the-job training. *See* 29 C.F.R. 95.33(e)(2)(ii). The payments were to be used to offset "the costs of recruiting, training, and supporting services which are over and above those normally provided by the employer." 29 C.F.R. 95.-

33(d)(2)(ii). Direct subsidization of wages for trainees employed by private employers is prohibited. 29 C.F.R. 95.33(d)(2)(iii).

**3.** The job developer testified that the Spigrin contract was the only one she had ever seen prepared there and Cannata himself testified that it was "highly unusual" for this to be done.

managers" they got from 10 minutes to one hour's instructions in the operation of the bar from Gilley, or from a barmaid, or from some other trainee. They received either no training whatever or no training more than the few minutes given them by Gilley. Thereafter, they had no regular contact with the Spigrin operation, except for an occasional visit by Gilley.

The same lack of training was apparent in the case of a "carpenter" trainee and an "accountant clerk" trainee subsequently hired by Tamargo. The carpenter, a man named Mathias, had previously fixed up a bar for Cesar Rodriguez; Tamargo had seen the work and was pleased with it and when Mathias applied to him for a job as carpenter, Tamargo indicated that he was willing to employ him because of the quality of the carpentering that he had seen done by Mathias. Thereafter, he did remodeling work at the Spigrin bars. He had no training and no supervision.

Linda Bowling showed up at TCEP to apply for a job training certification to work for Spigrin as an "accounting clerk." Linda Bowling had been a secretary to Cannata who was then director of TCEP, for about a year some five years previous to this occurrence. She went to work in May, 1975 for Spigrin, at which time Tamargo sent her to the O'Steen offices to familiarize herself with the O'Steen business operations before they were taken over by Spigrin. She worked under O'Steen's bookkeeper, whom Tamargo had asked to show Bowling the bookkeeping, payroll, and accounting systems. She worked there for approximately one month before the sale was completed. Upon completion of the sale, the O'Steen bookkeeper's daughter who had been working there also, joined the Spigrin staff as an accountant clerk, not under the TCEP program. Shortly thereafter, Bowling made her appearance seeking TCEP approval for a job. After discussion with Cannata, Didier decided that Bowling was eligible for a training job as "accounting clerk." She started work on July 23 as head of the Spigrin office, receiving no further training from anyone and reporting to no one other than Tamargo, as the owner of the business. There was no one employed by Spigrin who either purported to, or actually did, give her any training.

In making application for the job with TCEP, Bowling signed two documents in connection with her application, on one of which she stated that she had been unemployed for 20 weeks, with the last date of employment on March 25, 1975, and on the other of which she stated that her last employer had been the Hillsborough County Museum, where she had served as public relations director. She made no reference to her prior employment with Spigrin, the company for which she had just received a month's training under the former owner.

Shortly after the beginning of the six weeks period, Tamargo approached Didier requesting an extension of the subsidized training periods from six weeks to six months. Tamargo said that the extension was necessary to complete the training of the individuals hired under the contract. Didier compromised at 20 weeks. He asked Tamargo whether training was in fact being provided; he was assured that it was, and Tamargo told him that the accounting clerk trainee, appellant Bowling, was being trained by an accountant. Didier then spoke to Cannata about the request for an extension and the latter told him to go ahead if Didier thought the extension was "feasible." Thereupon, an amended contract specifying a training period of 20 weeks for bar managers and accounting clerks and 16 weeks for carpenters was approved.

One of Bowling's duties as office supervisor when she went back to work for Spigrin was to distribute and collect the time sheets filled out by the TCEP trainees, listing the hours they worked. These served as billing invoices for payment of TCEP funds for the training costs incurred. Tamargo signed and sent the invoices to TCEP listing for each trainee the hours they were employed per month by Spigrin. When they were received at TCEP, Cannata approved the amounts listed for payment of CETA funds.

On the basis of this certification, checks were made out and paid to Spigrin, using the United States mails.

## II. CONSTITUTIONALITY OF TITLE 18 665(a) AS APPLIED

■ Appellants Cannata and Bowling contend that § 665(a)[4] is unconstitutional as applied to them because nowhere within the Act does the statute define the term "willfully misapplies." They cite no case in support of this argument. We are satisfied from this Court's earlier decisions construing the terms "misapply" under other statutes that the prohibition is couched in language that cannot successfully be attacked on vagueness grounds. *United States v. Mann*, 517 F.2d 259 (5th Cir. 1975); *United States v. Wilson*, 500 F.2d 715, 720 (5th Cir. 1974) (both misapplication of bank's fund charges.)

■ The trial court here properly charged the jury "to misapply money or property means a willful conversion or taking of such money or property to one's own use and benefit or the use and benefit for another, with intent to defraud." This instruction is consistent with this Court's language in the cited cases.

## III. SUFFICIENCY OF THE EVIDENCE

(a) *As to Tamargo*:

■ The facts as recited above leave little doubt as to the presence in the record of more than adequate evidence from which a jury could find Tamargo guilty beyond a reasonable doubt. It is evident that after consultation with the local director of the CETA program, he instituted a course of action which the jury could find was intended to cause the federal funds, funneled through CETA, to pick up more than half of his new payroll for most if not all of the managers of his nine "black" bars. Moreover, the jury could find that Tamargo knew either that no training was needed, in the usual sense of the word, or not more than a few hours of training could be used for making a person eligible to be employed full time as such a bar manager.

Finally, even though some training had been necessary, there was more than ample evidence from which the jury could find that absolutely none was given to the CETA trainees employed by Spigrin. As to the one or two employees who apparently worked in bars that required a little more knowledge than the others, the record discloses that they were hired because of their previous training and experience and they were thus not properly eligible as entry level trainees.

(b) *As to Cannata*:

■ Cannata took the witness stand and, contrary to the testimony of half a dozen other witnesses, made the astounding statement that it would take five years to qualify as a bar manager. He also denied knowing much about the operation of the "black" bars. However, the jury could, and it apparently did, believe Didier's testimony to the effect that Cannata told him:

[H]e had—he had worked on (sic) the black bar and naturally, was telling me that it can be—there are not that many black people that might be involved in managing bars, because many of them are owned sometimes by others than blacks and are managing. It would be a good opportunity for many of our clients—our clients. We work with a lot of black individuals.

Moreover, even though the jury should not accept the suggested difference between "black" bars and "neighborhood

---

**4.** This Section provides as follows:

*Theft or embezzlement from employment and training funds: improper inducement: obstruction of investigations*
(a) Whoever, being an officer, director, agent, or employee of, or connected in any capacity with any agency receiving financial assistance under the Comprehensive Employ-ment and Training Act knowingly hires an ineligible individual or individuals, embezzles, willfully misapplies, steals, or obtains by fraud any of the monies, funds, assets, or property which are the subject of the grant or contract of assistance pursuant to such Act shall be fined not more than, etc.

black" bars which Cannata in other testimony attempted to magnify, the jury may well have believed that even at the "neighborhood black" bars a maximum of a few days of training was all that was required. This was testified to by Jerome Thomas who managed Leonard's Bar which is the one which Cannata owned and operated jointly with the Spigrin stockholder. Thomas testified that his training at Leonard's was from one to one and a half days or up to a week.

Although Cannata had testified that he knew nothing of the "black bars" which Tamargo was buying, he himself testified: "I told him [Didier] that they primarily—it was a bar business, that it concerned some black bars in the neighborhood."

Inferences that could reasonably be drawn from the fact that the recruiter, Mrs. Bellivueau, was brought into Cannata's office and introduced by him to Tamargo as a person who was interested in working out a contract and that the contract that resulted was the work of a "joint conversation" between her, Tamargo, and Cannata would fully warrant the jury's concluding that Cannata knowingly participated in the scheme to funnel funds into Tamargo's business for improper purposes. The preparation and approval of vouchers thereafter representing such funds and the mailing of them was the subject of the other counts on which Cannata was convicted. The jury verdicts here were also amply supported by the record.

(c) *As to Bowling*:

 Bowling does not contend that the evidence was insufficient to sustain her conviction on Counts Four through Fifteen, asserting only that the evidence was insufficient to warrant her conviction under the § 1001 counts, Counts Two and Three of the indictment. Appellant correctly states that a conviction under § 1001 requires proof that the defendant had the specific intent to make a false or fraudulent statement deliberately or at least with reckless disregard of the truth and with the purpose to avoid learning the truth. *See United*

States v. Lange, 528 F.2d 1280 (5th Cir. 1976). However, citing no cases as a basis of comparison, appellant is content with an argument that "the jury could not reasonably have concluded that the evidence and reasonable inferences drawn from it establishes Bowling's intent to deceive beyond a reasonable doubt." She argues, in effect, that when Bowling failed to state that within a period of a few weeks previously she had already been working at the Spigrin office in the same capacity for which she was now seeking certification as an entry employee for training to fill the job the documents were intended only to give evidence of her previous experience, and that knowledge of this fact of her prior employment would have been immaterial to the TCEP officials. To the contrary, we think it quite likely that the jury did infer, as it could from the omission of this information, that Bowling's application for employment as an entry trainee as an accounting clerk was approved, whereas otherwise it might well have been rejected. In point of fact, appellant's brief acknowledges that if the application form had truthfully stated the facts, her former Spigrin employment "would be just one factor to be considered in her overall qualifications." This clearly indicates that the omission was material to the official's consideration of her application.

We conclude that the evidence was sufficient to permit a jury to conclude beyond a reasonable doubt that the omission was intentional and made for the purpose of deceiving TCEP officials.

## IV. OTHER GROUNDS OF APPEAL

We have carefully considered the other grounds of appeal asserted by the several appellants, *i. e.*, mistaken statement by the trial court: "You can ask her" when a male witness was on the stand, as improperly calling attention to the later failure of the appellant Bowling to take the stand; the court's charge to the jury dealing with a conspiracy, which charge was dismissed by the court; and exclusion by the court of documents offered by the defendants under

352

the Business Records Exception to the Hearsay Rule, Rule 803, Federal Rules of Evidence.

We conclude that the court's disposition of each of these grounds of appeal was correct. The judgments are AFFIRMED.