**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**William C. BROWN,
Defendant-Appellant.**

Nos. 83–2004, 83–2104.

United States Court of Appeals,
Seventh Circuit.

Argued March 30, 1984.

Decided Aug. 22, 1984.

**364**

Nikki M. Zollar, Chicago, Ill., for defendant-appellant.

Ted S. Helwig, Asst. U.S. Atty., Dan K. Webb—U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before ESCHBACH and POSNER, Circuit Judges and SWYGERT, Senior Circuit Judge.

1. The appellant was sentenced to five years incarceration on Counts 1 and 3 (violations of § 1001) and a concurrent two-year sentence on Counts 2, 3, and 4 (one violation of § 1001; two violations of § 665). A five-year probationary period, to run consecutively to appellant's imprisonment, was imposed on the remaining counts.

ESCHBACH, Circuit Judge.

The appellant, William Brown, was charged with six counts of willfully misapplying or embezzling Comprehensive Employment and Training Act ("CETA") funds, 18 U.S.C. § 665, and six counts of making material false statements in a matter within the jurisdiction of a federal agency, 18 U.S.C. § 1001. One of the § 665 and one of the § 1001 counts were dropped before the bench trial in this case, and the appellant was convicted on the remaining counts.[1]

On appeal, Brown challenges the sufficiency of the evidence on all of the counts and the denial of his post-trial motions relating to the adequacy of his representation and to the government's alleged failure to disclose exculpatory material specifically requested by Brown. We have reviewed the appellant's claims, find them to be without merit, and accordingly affirm the judgments of conviction.

## I.

During 1981, the Archdiocese of Chicago conducted two programs to provide training and employment for economically-disadvantaged youths. Both programs were funded by the United States Department of Labor, which allocated CETA funds to the programs pursuant to contracts with the City of Chicago. The Archdiocese implemented its programs through various community groups which were invited to participate. In January or February, 1981, Brown contacted the Archdiocese and indicated that he wanted to open a CETA work site at the Glacier Center, which he operated. As it had with approximately 100 other work sites involved in its programs, the Archdiocese entered into a "work-site agreement" with Brown, specifying the location of the site, the type of work the participants would perform, the work-site supervisor, and the number of young people to be involved.

Work-site supervisors had the primary responsibility for implementing and monitoring the CETA-funded programs. They managed the activities at the site, solicited and supervised participants, monitored the scheduled activities, kept and reported time records for payroll purposes, and distributed paychecks. Because there are extensive eligibility requirements for participation in CETA-funded programs, the Archdiocese gave each work-site supervisor, including Brown, a training session concerning the documentation required to authorize a young person to participate. Once the participant's eligibility was documented and his participation approved by both the Archdiocese and the City of Chicago, he was certified to begin work in the program.

During the summer of 1981, Brown, as the Glacier center work-site supervisor, submitted a number of time sheets that falsely claimed that individuals who had been certified to participate in the program had worked a number of hours at the Center. Accordingly, the Archdiocese issued paychecks to these individuals based on the hours claimed on the time sheets and sent them to Brown for distribution. Brown subsequently forged the names of the payees and cashed the checks.

At trial, four of the persons in whose names Brown received paychecks testified that they had never worked at the Center. A fifth person had worked at the Center for four weeks, but had been paid for only two of those weeks. It was established that Brown had submitted time sheets indicating that each of these individuals had worked various hours at the Center, when in fact they had not. Brown admitted these facts but claimed that he had distributed the proceeds from the paychecks to other eligible but uncertified young people that he had substituted in the places of the certified workers whose names appeared on the time sheets. He claimed that the substituted workers had actually worked the hours indicated on the sheets. Brown could not remember the names of any of these substituted workers, and none testified at trial.

After the bench trial in his case was concluded, Brown filed a *pro se* motion for a new trial, asserting that his court-appointed counsel had inadequately represented him. Brown also retained new counsel, who filed a separate motion for a new trial which alleged that the government had violated the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose an allegedly exculpatory interview with the mother of a substituted worker. The district court denied both motions without a hearing.

## II.

### A. Section 665

To obtain a conviction under § 665, the government must prove (1) that the accused was an officer, director, agent, or employee of an agency receiving financial assistance under CETA; and (2) that the accused embezzled, willfully misapplied, stole, or obtained by fraud "moneys, funds, assets or property that are the subject of a grant or contract of assistance." *United States v. Coleman*, 590 F.2d 228, 230 (7th Cir.1978). The appellant urges that the government's proof of the second of these elements fails because the government did not show what, if anything, the appellant did with the money he received when he cashed the Archdiocese paychecks. Relying on *United States v. Overbay*, 444 F.Supp. 259 (E.D.Tenn.1977), Brown argues that proof of what was actually done with the money is essential to the government's case.

The indictment in *Overbay* charged that the defendant "willfully and knowingly embezzled and obtained by fraud" money in the form of checks, and that she thereafter forged the names of the payees on the checks and "converted [the proceeds] to her own use." *United States v. Overbay*, 444 F.Supp. 256, 257 (E.D. Tenn.1977) (companion case challenging only sufficiency of indictment). At trial, the defendant, who directed a CETA-funded program, testified that she had indeed

cashed checks made payable to others, but that she had distributed the proceeds to other children in the program in accordance with the program's goals. After a jury was unable to return a verdict, the trial court directed a verdict of acquittal. The court noted that the prosecution's proof did not conform to the allegations in the indictment because there was no proof that Overbay had converted the funds to her own use. On the contrary, the court expressly credited Overbay's testimony about the use of the funds. The court stated:

> [I]t was essential that there have been probative evidence presented as to [the] means [used to embezzle the funds] *as alleged in the indictment:* this included evidence not only that she *received* the proceeds of the manpower checks but that she then " * * * converted the proceeds to her own use, well knowing that she was not entitled thereto. * * *"

*Overbay,* 444 F.Supp. at 262 (emphasis added). Contrary to Brown's assertions, *Overbay* does not stand for the proposition that proof of conversion *to the defendant's use* is essential to every conviction under § 665.[2] It merely applies the well-settled rule that the proof presented in a criminal trial must conform to the allegations in the indictment. The indictment here did not charge that Brown converted the funds to his own use.

Moreover, the indictment in this case charged more than embezzlement; it also charged willful misapplication of funds. In *United States v. Tamargo,* 637 F.2d 346 (5th Cir.), *cert. denied,* 454 U.S. 824, 102 S.Ct. 112, 70 L.Ed.2d 98 (1981), the court approved the trial court's use of a jury instruction that stated that "misapplication of funds" for purposes of § 665 meant the conversion of funds to the defendant's own use or the use of another. *Id.* at 350.

■ The statute's prohibition of "misapplication of funds" seems particularly appropriate in light of the programs that § 665 is designed to protect. Under the CETA program, the federal government disbursed large amounts of money to the states to be used for the training and education of economically-disadvantaged young people. *See generally* 29 U.S.C. §§ 801–992 (repealed October 13, 1982). The necessity of controls over those who ultimately obtain money under the CETA program is self-evident: only if the state recipients could assure that the funds actually benefitted those for whom the programs were designed could CETA's goals be fulfilled. Accordingly, several levels of approval were required before an individual was deemed certified to participate in the Archdiocese programs. The work-site supervisor could not certify someone as eligible for CETA participation, although applications often originated with the supervisors and they were responsible for obtaining the necessary documents from applicants.[3] When work-site supervisors such as Brown make *ad hoc* decisions about eligibility, the controls designed to assure that only qualified individuals, receive government funds are subverted. We hold, therefore, that the conversion of CETA funds for the use of uncertified workers when the defendant knows of their

**2.** We note that the court in *Overbay* expressly credited the defendant's testimony, whereas the trial court in this case found Brown's testimony completely incredible. If Brown's testimony is discredited, then the government has shown that Brown forged the names of payees on payroll checks and cashed them. It is not necessary for the government to prove by direct evidence that Brown thereafter used the money for personal purposes. Circumstantial evidence that the defendant was the last known person to possess the funds is sufficient to support a finding that he converted them to his own use. *See O'Malley v. United States,* 378 F.2d 401, 403 (1st Cir.1967). We also note that Brown's reliance on the fact that his testimony was uncontradict-

ed is inapposite. The trier of fact is not required to credit the testimony of any interested witness, even if that testimony is uncontradicted. *See United States v. Trull,* 581 F.2d 551 (5th Cir.1978); *Taylor v. United States,* 320 F.2d 843 (9th Cir.1963), *cert. denied,* 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612 (1964).

**3.** Brown had been instructed in the certification process during orientation into the Archdiocese program, at which time he was admonished that uncertified individuals were not to be allowed to work. Brown had also been involved previously with other CETA-funded programs.

uncertified status is a willful misapplication of funds for purposes of § 665.

### B. Section 1001

■ In order for a false statement to be actionable under § 1001, it must be "material"—that is, it must have a "natural tendency to influence, or [be] capable of influencing, the decision of the [government agency] in making a determination required to be made." *United States v. DiFonzo*, 603 F.2d 1260, 1266 (7th Cir.1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980). Relying on *United States v. Radetsky*, 535 F.2d 556 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976), Brown argues that, in order to prove his statements were capable of influencing the Archdiocese to issue paychecks, the government was required to prove the certified status of each worker for whom hours were falsely submitted. Brown contends that the government did not make this showing.

In *Radetsky*, the defendant, a physician, submitted a number of claims under the Medicare program seeking reimbursement for drugs and services allegedly rendered to qualified individuals. The government proved that a number of these claims were false because the defendant had not actually provided patients with the drugs and services he claimed, and Radetsky was convicted of 32 violations of § 1001. The proof at trial showed that a number of the false statements related to claims for reimbursement for drugs which were non-compensable under Medicare guidelines. The defendant argued that these counts should not have been submitted to the jury, reasoning that since the drugs were non-compensable, the false statements requesting reimbursement were immaterial as a matter of law. The court agreed. While noting that the government is not required to prove actual loss, the court stated that the claims were incapable of inducing agency action since no payment could have been authorized for the use of the drugs.

Brown argues that his case is indistinguishable from *Radetsky*. According to Brown, the government failed to establish that every individual listed on the time sheets was certified. Since the Archdiocese is only authorized to pay certified participants, Brown reasons that false claims for payment on behalf of uncertified individuals would be incapable of influencing the decision to issue paychecks.

Initially, we disagree with Brown's assessment of the government's proof at trial. The government introduced documents with respect to four of the individuals in whose names Brown received checks which indicated that they had been certified for participation in the program. In addition, there was testimony that the time rosters and payrolls for each work site were generated from final certification documents; therefore, only those individuals who had been certified would appear on the payroll.

■ There is, however, an additional distinction between this case and *Radetsky*. Under Medicare, requests for reimbursement originate with physicians. Since physicians provide many kinds of treatment, Medicare has developed guidelines for determining which items qualify for reimbursement. There is no guarantee, therefore, that a physician will be reimbursed for every item submitted; payment is dependent upon the compensability guidelines. As another court has noted, "[*Radetsky* ] was based on the principle that since the claims for payment, aside from any falsity, were clearly not compensable under the ... government program regulations, they were incapable of influencing the government and thus were immaterial." *United States v. Voorhees*, 593 F.2d 346, 350 (8th Cir.), *cert. denied*, 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979). In this case, the Archdiocese issued individual time sheets for each participant. A new time sheet was issued for each certified individual every two weeks. Tr. 23. Thus, the Archdiocese was relying on the work-site supervisor only to assure that the person whose name appeared on the sheet had signed the sheet, and had actually worked the hours claimed. It is undisputed that the submission of completed time

sheets, authenticated by the signature of the work-site supervisor, triggered the issuance of paychecks. The government proved that the false statements on the time sheets, which claimed that the individuals listed on the sheets had performed work, were not only capable of influencing the decision of the Archdiocese to issue checks, but that they did in fact cause the Archdiocese to issue checks in this case. We hold that the materiality of the statements was established.

### C. Denial of Post-Trial Motions

Acting *pro se,* Brown filed a motion for a new trial in which he accused his attorney of incompetence. Brown now claims that the trial court erred in denying his motion without a hearing.

Judgment was entered in this case on March 22, 1983, and sentencing set for April 28, 1983. On April 28, Brown's trial counsel informed the court that Brown wished to retain other counsel. The court therefore rescheduled the sentencing hearing for May 19, and directed that Brown's new counsel file any post-trial motions by May 9. Brown's motion for a new trial was filed May 17.

■ Fed.R.Crim.P. 33 states that all motions for new trial based on grounds other than newly-discovered evidence "shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix within that 7-day period." A district court may not entertain a motion for new trial filed beyond the 7-day limit in Rule 33, *United States v. Fontanez,* 628 F.2d 687 (1st Cir.1980), *cert. denied,* 450 U.S. 935, 101 S.Ct. 1401, 67 L.Ed.2d 371 (1981); *United States v. Brown,* 587 F.2d 187 (5th Cir.1979); *see* 8A J. Moore, Moore's Federal Practice ¶ 33.-02[2] (2d ed. 1981), unless the motion is based on newly-discovered evidence or the judge has extended the filing date during the 7-day period. Since Brown's motion was filed well beyond the 7-day limit, and the limit was not extended during that 7-day period by the trial judge, it could only be timely if it were based on newly-discov-

ered evidence. It was not. The allegations of misconduct in the motion on their face refer to actions of Brown's trial counsel known to Brown before and during trial. Noting that post-conviction remedies are available to defendants who urge vacation of their convictions by reason of deficient performance of trial counsel, this court has previously refused to construe untimely new trial motions based on alleged counsel ineffectiveness as motions based on newly-discovered evidence, where the motion on its face refers to actions known to the defendant at the time of trial. *United States v. Ellison,* 557 F.2d 128, 133–134 (7th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977). The trial court did not err in denying the motion.

■ Counsel's motion for new trial based on alleged *Brady* violations fares no better. The motion alleged that the government had conducted an interview with a witness who would have substantiated Brown's story that he distributed the funds to uncertified workers. The government disputes the claim that it ever received such information. However, given our holding in Part A, *supra,* that the statute is violated by conversion of CETA funds to the use of third parties, the information, even if it existed, would not be exculpatory. We find no error in the denial of the motion.

### III.

For the reasons expressed above, the judgments of conviction are affirmed.