**Frank KASPER, Plaintiff–Appellee,**

v.

**SAINT MARY OF NAZARETH HOSPITAL, Defendant–Appellant.**

No. 97–1977.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1997.

Decided Feb. 6, 1998.

Rehearing Denied March 9, 1998.

Christopher T. Hurley (argued), Christopher T. Hurley & Associates, Chicago, IL, for Plaintiff-Appellee.

Joshua G. Vincent (argued), Tom H. Luetkemeyer, Linda K. Horras, William G. Swindal, Hinshaw & Culbertson, Chicago, IL, for Defendant-Appellant.

Before POSNER, Chief Judge, and COFFEY and ROVNER, Circuit Judges.

POSNER, Chief Judge.

The plaintiff, Frank Kasper, was assistant director of security at a Chicago hospital. In January of 1993 the hospital fired him. He brought suit under the federal age discrimination law (he was 42 when he was fired), adding a supplemental claim under Illinois law in which he charged that he had been fired in retaliation for having filed a workers' compensation claim. The case was tried to a jury, which found for the hospital on the age discrimination claim but for Kasper on the claim of retaliation, awarding him $86,000 for lost wages to the date of trial, $400,000 for lost future wages, $150,000 for emotional distress, and $75,000 in punitive damages. The hospital contends on appeal that it was entitled to judgment as a matter of law or at least to a new trial and that in any event the damages awarded were excessive.

The case was close, but there was enough evidence of retaliation to allow the issue to go to the jury. Kasper had been employed by the hospital for 19 years, at first as a security guard, later as a sergeant of guards, and since 1983 as the assistant director of security, which made him the number two man in a staff of more than 20. The hospital is in a bad neighborhood, and Kasper had been injured several times in scuffles with unruly patients and visitors. He had been an exemplary employee and had received steady merit-based raises which by the time of his dismissal had brought his salary and benefits up to $43,000. The hospital was concerned about costs, and in March of 1992 Kasper's immediate superior, Mizia, recommended the elimination of the assistant director's position, but no action was taken on his recommendation.

Kasper injured his ankle seriously in a scuffle with a patient in September of 1992. He submitted a workers' compensation claim for which he eventually received an award of $9,000, the cost of which, the record suggests, was borne at least indirectly by the hospital. When he returned to work, in December, he was able to do only light work, so he was put behind a desk to monitor the hospital's security video system. Testimony by Kasper and particularly by Velez, who was secretary to the hospital's personnel chief, Henry, and whom the hospital did not cross-examine, indicated (if it was believed) that Henry and Mizia had been angry with Kasper because of the injury. Henry was very concerned about the cost to the hospital of workers' compensation claims. According to Velez, he tried to discourage the filing of such claims by denying that they were work-related, and was upset when he learned that Kasper had received medical authorization to be off work. Velez heard Mizia say that "he would get [Kasper's] ass back to work," though there was no basis for suspecting malingering. Neither Mizia nor Henry testified that they thought he was malingering. They merely denied, contrary to the testimo-

ny of Velez and Kasper, that they had been angry at Kasper for being injured, missing work, or filing a claim. Yet during this period he received his first critical performance review; he testified that the criticism was unwarranted.

The hospital claimed that it fired Kasper merely as part of a corporate downsizing. Yet very few other employees, and none in the security staff, were fired. And shortly afterward the hospital hired two more security guards, which made the security staff larger (though by one position, not two, because Kasper's position as assistant director was not filled, and remained unfilled at the time of the trial in 1996) than before the "downsizing."

Rather than being demoted to security guard, Kasper was told that he was no longer an employee of the hospital. He testified that because of this and the general chilly atmosphere surrounding his abrupt dismissal, he did not apply to return to his old job as a security guard (the sergeants' positions having been eliminated years before). He testified that as a result of the loss of the job he was forced to declare bankruptcy and in consequence lost his house. When he recovered from his ankle injury, in the summer of 1993, he went job-hunting. He found a job as a security guard in a shopping mall. The job paid only half as much, however, as his position as the hospital's assistant director of security.

■ From this evidence it was possible for a rational jury to infer that Kasper was indeed fired because he filed a workers' compensation claim. Obviously the jury was not *compelled* to draw such an inference. Henry and Mizia testified emphatically that the claim had no connection with the decision to fire Kasper, the decision being merely an innocently delayed response to Mizia's recommendation of March 1992. But of course the jury didn't have to believe their testimony, an elementary point that the hospital ignores in its brief. The hospital seems to assume that testimony that is not specifically contradicted must be believed; this is incorrect. E.g., *EEOC v. G–K–G, Inc.*, 39 F.3d 740, 746 (7th Cir.1994); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 934–36 (7th Cir.1988); *United States v. Brown*, 742 F.2d 363, 366 n. 2 (7th Cir.1984); *Negron v.*

*City of Miami Beach*, 113 F.3d 1563, 1570 (11th Cir.1997); *Scarfo v. Cabletron Systems, Inc.*, 54 F.3d 931, 942 (1st Cir.1995).

■ If Velez's testimony was believed— and remember that the hospital did not cross-examine her, which may have led the jury to believe that the hospital itself thought she was telling the truth—then Kasper's compensation claim may have been the straw that pushed Henry to accept Mizia's recommendation of months earlier to abolish Kasper's position. It does seem suspicious that an employee who had done such good work for so many years was fired rather than merely demoted, it being clear from the hospital's action in promptly hiring two more security guards that it had a vacancy that Kasper could have filled. Not immediately, because of his injury; but there is evidence that there was enough light work (which was rotated among injured employees) to have kept him occupied until he recovered. According to Velez, Henry was concerned with controlling the costs of workers' compensation and suspicious of employees who filed such claims. Both the critical performance review and the "downsizing" could have been found to be pretextual, that is, phony; and a jury can (though it need not) infer improper motive from pretext. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 and n. 4, 113 S.Ct. 2742, 2749 and n. 4, 125 L.Ed.2d 407 (1993); *Van Vlerah Mechanical, Inc. v. NLRB*, 130 F.3d 1258, 1264 (7th Cir.1997); *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir.1997); *Ryther v. KARE 11*, 108 F.3d 832, 836–37 and n. 2 (8th Cir.1997) (en banc); *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995).

■ The case came down to a credibility contest. If the jury believed Kasper and Velez, he won; if it believed Henry and Mizia, the hospital won. When a case turns on credibility, neither side is entitled to judgment as a matter of law unless objective evidence shows that it would be unreasonable to believe a critical witness for one side. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *Seshadri v. Kasraian*, 130 F.3d 798, 801–02 (7th Cir.1997).

But since it was a close case, we must give close consideration to the hospital's claims that the judge committed errors in the conduct of the trial. Oddly, the alleged error on which the hospital's appellate counsel laid the heaviest weight at oral argument does not appear in the hospital's opening brief (or for that matter in the reply brief, but that would be too late, e.g., *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 666 (7th Cir.1995); *United States v. Rodriguez*, 888 F.2d 519, 524 (7th Cir.1989)) and is therefore waived. E.g., *United States v. Beltran*, 109 F.3d 365, 371 (7th Cir.1997); *Pittman v. Commissioner*, 100 F.3d 1308, 1310 n. 2 (7th Cir.1996); *Sample v. Aldi*, 61 F.3d 544, 551 n. 1 (7th Cir.1995). It is the admission into evidence of testimony that Kasper's loss of his job precipitated his declaration of bankruptcy. The hospital's briefs mention that the hospital objected to the admission of this evidence at trial, and it did, but the briefs do not argue that the judge erred in overruling the objection.

So the argument is waived, and anyway it clearly has no merit, since the evidence was germane to Kasper's claim that he suffered emotional distress as a consequence of being fired, a proper item of damages in a retaliation case under Illinois law. *Kritzen v. Flender Corp.*, 226 Ill.App.3d 541, 168 Ill. Dec. 509, 520, 589 N.E.2d 909, 920 (1992); *Sloan v. Jasper County Community Unit School Dist. No. 1*, 167 Ill.App.3d 867, 118 Ill.Dec. 879, 522 N.E.2d 334 (1988); *Peeler v. Village of Kingston Mines*, 862 F.2d 135, 137–38 (7th Cir.1988). What is more, the hospital had and took an opportunity to counter this testimony by placing in evidence the Kaspers' joint federal income tax returns for 1992 and 1993, which showed only a $15,000 drop in the couple's income (from $70,000 to $55,000). Kasper gave what appears from the transcript to have been affecting evidence regarding his emotional reactions to being suddenly without a job at a time when his injury prevented him from effective job hunting, and the hospital does not contend that the award of $150,000 for emotional distress was excessive, although, given the absence of the sort of evidence found in cases that have sustained equivalent or even larger awards, such as *Fleming v. County of Kane*, 898 F.2d 553, 562 (7th Cir.1990), a strong argument that it was excessive could have been based on *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1228–30 (7th Cir.1995); see also *Cygnar v. City of Chicago*, 865 F.2d 827, 848 (7th Cir.1989); *Bailey v. Andrews*, 811 F.2d 366, 375–76 (7th Cir. 1987); *Taliferro v. Augle*, 757 F.2d 157, 161–62 (7th Cir.1985); *Spence v. Board of Education*, 806 F.2d 1198, 1201 (3d Cir.1986). In its zeal to argue a ground that had not been raised, the hospital overlooked a solid ground.

The claims of trial error that the hospital has preserved concern the exclusion of two sets of documents related to Kasper's workers' compensation claim. The first consists of the checks that he received pursuant to the workers' compensation award. The hospital wanted to put them into evidence for two reasons. The first was to counter the impression that Kasper's loss of his job at the hospital had been a financial catastrophe for him. See *Barrera v. E.I. DuPont De Nemours & Co.*, 653 F.2d 915, 920–21 (5th Cir.1981). But as there was no dispute that he received workers' compensation or how much he received, the checks would have added nothing to the evidence that was already before the jury. The second purpose was to show that because copies of the checks were sent to the hospital, the hospital had no reason to think that Kasper wanted to work. We cannot fathom this explanation. The checks do not state what they are for. They just show that Kasper received a $500 check every two weeks for a period of time.

The second and more important set of documents consists of Kasper's application for benefits and the order (titled "Settlement Contract/Lump Sum Petition and Order," but we'll call it "settlement order") in which the state workers' compensation commission granted the application pursuant to an agreement between Kasper and the hospital. Only the order need be discussed. It was signed by Kasper, his lawyer and the hospital's lawyer (both lawyers were employed by different firms from the ones involved in the lawsuit, however), in October of 1993, ten days after he filed this lawsuit. The order recites that Kasper had a "temporary total disability" from September 21, 1992 (the date

of the accident), to June 12, 1993, with the exception of the period between December 7, 1992, when he returned to work and was given light work, and January 14, when he was fired. The order form asks whether the applicant has returned to his regular work for the employer and if not why not. The answer "no" is marked and the explanation stated is "Petitioner's [that is, Kasper's] job eleminated [sic] due to corporate downsizing."

The hospital wanted to use this document for two purposes. The first was to impeach Kasper's testimony. He had been asked on direct examination whether he had ever had a "total disability" and he had answered "no." Kasper's lawyer objected to this use of the document on the ground that in the Illinois law of workers' compensation "temporary total disability" is a term of art. It means that the worker is disabled from all but light work and he cannot find anyone to employ him for light work, so that he is as if totally disabled, and that's good enough to entitle him to benefits. *Archer Daniels Midland Co. v. Industrial Comm'n,* 138 Ill.2d 107, 149 Ill.Dec. 253, 259, 561 N.E.2d 623, 629 (1990); *Whitney Productions, Inc. v. Industrial Comm'n,* 274 Ill.App.3d 28, 210 Ill. Dec. 770, 772, 653 N.E.2d 965, 967 (1995). That was Kasper's situation between when he was fired and when he recovered from the injury to his ankle. The district judge agreed with Kasper's lawyer that to explain all this would confuse the jury and since properly understood the settlement order was not impeaching it was better to keep it away from the jury. In so ruling the judge acted within her authority under Fed.R.Evid. 403. *Eastern Natural Gas Corp. v. Aluminum Co. of America,* 126 F.3d 996, 1002 (7th Cir.1997); *United States v. Zizzo,* 120 F.3d 1338, 1352 (7th Cir.1997); *Starrett v. Wadley,* 876 F.2d 808, 823 (10th Cir.1989).

The hospital could have tried to use the settlement order not to impeach Kasper's testimony but as an admission by a party opponent that he had been too disabled to do even light work for the hospital and therefore had to be let go, in which event the hospital would have been off the hook. *Hartlein v. Illinois Power Co.,* 151 Ill.2d 142, 176 Ill.Dec. 22, 30, 601 N.E.2d 720, 728 (1992). Instead, the hospital sought to use

the order as an admission that Kasper had lost his job with the hospital because it was eliminated in a corporate downsizing, just as the hospital's witnesses had testified. Kasper's lawyer objected. He said that he was prepared to call as a witness the lawyer who had represented Kasper in the proceedings before the workers' compensation commission and that this lawyer would testify that the order had been drafted entirely by the hospital's lawyer and that Kasper had signed on the dotted line to get his sorely needed workers' compensation. The judge said she agreed. Had it not been for what followed we would be inclined to consider the judge's "ruling" (if that's what it was) erroneous— possibly so erroneous, in light of the closeness of the case, as to be an abuse of the broad discretion that district judges have in ruling on evidentiary matters, and therefore a reversible error. *Murrey v. United States,* 73 F.3d 1448, 1456 (7th Cir.1996). Signed as it was *after* this lawsuit had been filed, the settlement order contains on its face an unequivocal admission by the plaintiff with regard to a key contention of the defense.

But what followed the judge's statement that she agreed with the plaintiff's lawyer was—nothing. The defendant's lawyer did not say, "Let us put the admission into evidence, and we will take our chances with what Kasper or Kasper's compensation lawyer testifies in rebuttal." A possible implication of the lawyer's silence was that he preferred not to give Kasper an opportunity to explain away the admission. He may have believed that Kasper would have little difficulty in doing so, and perhaps that Kasper would turn the tables on him by convincing the jury that the hospital's lawyer had coerced Kasper into signing the "admission" by making it a condition of his obtaining disability payments that he desperately needed. In other words, the silence of the hospital's lawyer may have been tactical.

A lawyer who is forbidden to introduce some bit of evidence need not, in order to preserve a challenge to the judge's ruling for appeal, tell the judge that he is taking an exception to the judge's ruling. That traditional requirement was abolished by Fed.R.Civ.P. 46. He must, however, not

only make clear to the judge what the evidence is that he wants to present, Fed. R.Evid. 103(a)(2), but also his ground (unless it is obvious) for believing that the evidence should be admitted. Fed.R.Civ.P. 46; *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 174–75 and n. 22, 109 S.Ct. 439, 452 and n. 22, 102 L.Ed.2d 445 (1988); *Reck v. Pacific–Atlantic S.S. Co.*, 180 F.2d 866, 870 (2d Cir.1950); 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2472, pp. 94–99 (2d ed.1995); 21 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5040, pp. 210–11 (1977); cf. *United States v. Peak*, 856 F.2d 825, 832 (7th Cir.1988). He must, in other words, give the judge a fair chance to avoid error. *United States ex rel. Bostick v. Peters*, 3 F.3d 1023, 1029 (7th Cir.1993); *United States v. Dougherty*, 895 F.2d 399, 403–04 (7th Cir.1990); *Krause v. Chartier*, 406 F.2d 898, 901 (1st Cir.1968); *Hartford Accident & Indemnity Co. v. Bank of Commerce*, 170 F.2d 94, 95–96 (5th Cir.1948). It is implicit in this requirement that the party cannot withdraw the offer and then complain on appeal that the evidence wasn't admitted.

Consider the more common situation in which, after an objection to a question asked a witness is made and overruled, the lawyer who asked the question tells the witness (in order to minimize the chance of an adverse ruling on appeal) not to answer, that he will reword the question, and he does so, and this time the opposing counsel makes no objection. It would not be open to the opponent to argue on appeal that his original objection held because the rewording wasn't that significant. He would have acquiesced. *Krienke v. Illinois Central R.R.*, 249 F.2d 840, 845 (7th Cir.1957); *United States v. Critton*, 43 F.3d 1089, 1097 (6th Cir.1995); *United States v. Chandler,* 996 F.2d 1073, 1101 (11th Cir.1993); *United States v. Munoz*, 894 F.2d 292, 295 (8th Cir.1990); *United States v. Morris*, 827 F.2d 1348, 1350 (9th Cir.1987); cf. *Abromson v. American Pacific Corp.*, 114 F.3d 898, 903–04 (9th Cir.1997); *City of Richmond v. Madison Management Group, Inc.*, 918 F.2d 438, 453–54 (4th Cir. 1990). What happened here was essentially the same, except involving an offer of rather than an objection to evidence. The response of Kasper's lawyer to the offer was to threaten, as it were, to present evidence that would totally vitiate the hospital's evidence—that would indeed make the hospital look worse than if the settlement order was excluded. When the judge said she agreed, it was unclear whether she meant that the threat alone was a ground for excluding the order, which would have been an error, or whether she meant merely that if Kasper's evidence about the circumstances in which he signed the order was believed, the order would have no probative value for the hospital. If that is what she meant, she was not ruling on the hospital's offer to place the order in evidence, and, if not, the hospital's silence would be naturally interpreted as an abandonment of the offer. When a judge's ruling is ambiguous, a party cannot challenge it on appeal if he has taken no steps to get the judge to clarify it. See *United States v. Tatro*, 452 F.2d 1207 (2d Cir.1971) (per curiam).

The remaining issues relate to remedy. With regard to damages for lost future wages, the hospital's principal argument is that Kasper failed to mitigate them by searching assiduously for a job comparable to the one he had lost. But he testified that he looked for other jobs and that the job he took at the mall was the best he could get. It was for the jury to decide whether to believe him. E.g., *Maier v. Lucent Technologies, Inc.*, 120 F.3d 730, 738 (7th Cir.1997); *Hill v. City of Pontotoc*, 993 F.2d 422, 427 (5th Cir.1993); *Normand v. Research Institute of America, Inc.*, 927 F.2d 857, 865 (5th Cir.1991). The hospital also complains about Kasper's failure to seek reemployment with the hospital as an ordinary guard. But at least on the hospital's view of the facts, this cannot be a failure to mitigate; for we are about to see that according to the hospital Kasper would have been paid *less* as a security guard for the hospital than in the substitute employment that he obtained at the shopping mall.

The hospital argues that the jury had no basis for awarding Kasper $400,000 in lost future wages. Neither party called an expert witness on the issue. The only evidence presented by the plaintiff was Kasper's salary when he was fired ($43,000 with benefits), the fact that he had received annual raises every year with the hospital of at least

3 percent, his compensation in his job with the mall (about $20,000), and his intention to work till he was 65 or 70. On the basis of this evidence, Kasper's lawyer in his closing argument asked the jury to award in excess of $600,000 for lost future wages. Kasper was 46 years old at the time of the trial. If he worked another 19 years at $43,000, if he received a 3 percent raise each of those years, if he could expect a similar raise in his mall job, and if a discount rate of 3 percent is used to reduce the future wages to a present value, then, ignoring the possibility of death or disability during this period, the jury should have awarded him $437,000 in lost future wages: 19 × ($43,000 − $20,000).

The computational procedure that we have sketched, in which both inflation and discounting are ignored (inflation because it is a wash—it "inflates" both the discount rate and the wage—and discounting because the discount rate is assumed equal to the rate of increase in the annual wage), has been deemed proper, *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 540–49, 103 S.Ct. 2541, 2552–57, 76 L.Ed.2d 768 (1983); *Richardson v. Chapman*, 175 Ill.2d 98, 221 Ill.Dec. 818, 823, 676 N.E.2d 621, 626 (1997), app. allowed, 174 Ill.2d 581, 227 Ill.Dec. 12, 686 N.E.2d 1168 (1997); *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1199–1200 (7th Cir.1982), though we do not exclude the possibility of a successful challenge to it based on a factual showing that its assumptions are incorrect. See *Hull v. United States*, 971 F.2d 1499, 1511–12 (10th Cir.1992); Stuart M. Speiser, *Recovery for Wrongful Death and Injury: Economic Handbook* § 14:2 (3d ed.1988); Rolando F. Pelaez, "Calculating Awards for Lost Earnings: An Empirical Assessment of *Beaulieu*," 5 *J. Leg. Econ.* 49 (1995). But ignoring the risk of total disability before the age of 65, and particularly death, cannot be justified. *Price v. Marshall Erdman & Associates, Inc.*, 966 F.2d 320, 326–27 (7th Cir.1992). The risk that a 46–year–old white male will die before he reaches 65 is small but not trivial; it was estimated at 16 percent as of 1993. William Gary Becker & Michael K. Seck, *Determining Economic Loss in Injury and Death Cases, 1997 Cum.Supp.* 208 (2d ed.1993). But Kasper's lawyer *wanted* to give the jury the relevant life-expectancy table—and the hospital objected, and so cannot complain now that the table was not given to the jury.

■ Since Kasper's lawyer did not mention present value to the jury, it is extremely doubtful, to say the least, that the jury followed the method of computation that we have sketched. That is not fatal. Courts apply a bottom-line test to a jury's assessment of damages: if the jury could by a proper procedure have arrived at the amount it awarded, we do not insist on a showing that it did use a proper procedure. *Outboard Marine Corp. v. Babcock Industries, Inc.*, 106 F.3d 182, 186 (7th Cir.1997); *O'Shea v. Riverway Towing Co.*, supra, 677 F.2d at 1201; *Chambers v. Rush–Presbyterian–St. Luke's Medical Center*, 155 Ill. App.3d 458, 108 Ill.Dec. 265, 267, 508 N.E.2d 426, 428 (1987); *Jackson v. City of Cookeville*, 31 F.3d 1354, 1359 (6th Cir.1994). A more serious problem with the damages award is the assumption that Kasper would have retained his well-paying assistant director's position. The fact that the position has not been filled is pretty persuasive evidence that the position would indeed have been abolished, if not in January 1993 then surely before Kasper reached retirement age. The evidence is far more persuasive that the retaliation consisted in denying him employment at a lower level than that it consisted in abolishing his position. Just the fact that Kasper faced a substantial risk of losing his high-paying job would require the use of a higher discount rate (and hence lower award) to reflect the difference in risk between earnings in a volatile occupation and a judicial award of a lump sum equal to the present value of those earnings. *Price v. Marshall Erdman & Associates, Inc.*, supra, 966 F.2d at 327.

But the defense bobbled this issue, first by not even raising the volatility point, and second (and more consequential) by arguing to the jury that if Kasper hadn't been fired he would have been paid the same as a newly hired security guard, which was less than $16,000 and so less than what Kasper earned in his job patrolling the mall. The evidence was that the hospital, as is common, pays more to more senior employees even if they are doing the same job as the junior ones.

With 19 years of accumulated seniority, Kasper would have earned about $30,000 as a guard.

So we have the unfortunately common case in which the plaintiff asks the jury for too much in the way of damages and the defendant, instead of offering a plausible alternative (here, for example, based on the difference between $30,000 and $43,000), goes for broke and asks the jury to award nothing, even though nothing is too low. When a jury is given such a choice and chooses the higher figure, the defendant has only itself to blame for having gambled and lost. *Dishnow v. School District*, 77 F.3d 194, 198 (7th Cir.1996); *Avitia v. Metropolitan Club of Chicago, Inc., supra,* 49 F.3d at 1230; *East Hampton Dewitt Corp. v. State Farm Mutual Automobile Ins. Co.*, 490 F.2d 1234, 1245–46 (2d Cir.1973) (Friendly, J.). A jury cannot be blamed for failing to award an intermediate figure if neither party proposes such a figure.

No doubt the hospital regrets a number of the tactical decisions that it made at the trial, and after reading this opinion it may regret some of the tactical decisions it made on appeal. But as we find no reversible errors, the judgment is

AFFIRMED.