**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kenneth Eugene HADDOCK, Defendant–Appellant.**

**No. 91–3075.**

United States Court of Appeals, Tenth Circuit.

Feb. 14, 1992.

Limited Rehearing Granted May 15, 1992.

---

**1538**

Samuel Rosenthal, of Curtis Mallet–Prevost, Colt & Mosle, Washington, D.C., for defendant-appellant.

Kurt J. Shernuk (Lee Thompson, U.S. Atty., was with him on the brief), Asst. U.S. Atty., for plaintiff-appellee.

Before ANDERSON and TACHA, Circuit Judges, and CHRISTENSEN, District Judge.*

TACHA, Circuit Judge.

Defendant-appellant Kenneth E. Haddock appeals a jury verdict convicting him on two counts of misapplication of bank funds in violation of 18 U.S.C. § 656, six counts of bank fraud in violation of 18 U.S.C. § 1344, one count of false statement to a federally insured bank under 18 U.S.C. § 1014, and one count of making false statements to the Federal Deposit Insurance Corporation (FDIC) under 18 U.S.C. § 1007. Haddock raises the following issues on appeal: (1) whether the conviction on Count 10 of the indictment was insufficient to state an offense and consequently violated the Ex Post Facto Clause; (2) whether the district court erred in denying appellant's motion for new trial filed more than seven days after return of the verdict; (3) whether appellant was denied effective assistance of counsel in violation of the Sixth Amendment; (4) whether the district court abused its discretion in excluding certain documents from evidence; (5) whether evidence was sufficient to support the convictions on Counts 1, 2, 3, 5 and 9; (6) whether the district court erred in failing to give a good faith instruction on Counts 1, 2, 8, and 10; (7) whether there existed a fatal variance between allegations in the indictment and evidence presented at trial; and (8) whether the district court erred in computing the amount of "loss" caused by Haddock as defined by the Sentencing Guidelines. We exercise jurisdiction under 28 U.S.C. § 1291, and we affirm in part, reverse in part and remand for resentencing and for a new trial on two counts.

---

* The Honorable A. Sherman Christensen, Senior District Judge for the United States District Court for the District of Utah, sitting by designation.

## BACKGROUND

This case revolves around the defendant, Kenneth E. Haddock, and his involvement with two banks—the Bank of White City and the Bank of Herington—and with another entity, First Finance, Inc. Both banks were owned by Herington Bancshares, a bank holding company of which Haddock owned fifty-five percent of the stock. During the period at issue in this case, Haddock was chairman of the board and chief executive officer of both banks. He also served as president of both banks until July, 1987. Haddock established First Finance, Inc. in 1986 for the purpose of acquiring loans from the FDIC and other lending institutions. He was president and sole shareholder of First Finance. The charges in this case involve several separate transactions.

### Acquisition of First National Bank of Herington

On April 1, 1987, Haddock arranged with the FDIC for the Bank of Herington to purchase the failed First National Bank of Herington. As part of the arrangement, Haddock agreed that on April 3 Herington Bancshares would "inject" $960,892 in the Bank of Herington so that the Bank of Herington would meet the FDIC's minimum capitalization requirements necessary to absorb a bank the size of the First National Bank of Herington. On April 3, Haddock and the secretary of Herington Bancshares jointly executed a Herington Bancshares check to the Bank of Herington in the amount of $960,892. However, the Herington Bancshares account on which the check was written was funded with

only $611,000—almost $350,000 less than the amount of the check.[1] Not until April 15 did Haddock deposit enough additional funds in the Herington Bancshares account to cover the $960,892 check. Despite the lack of funds in the Herington Bancshares account, the check was never returned for insufficient funds. At trial, the government argued that Haddock's actions permitted Herington Bancshares to have interest-free use of approximately $350,000 for the period between April 3 and April 15. The jury returned a verdict of guilty (Count 1) for misapplication of the Bank of Herington's funds in violation of 18 U.S.C. § 656.

### Acquisition of the Easton Loan Package

During April of 1987, Haddock, on behalf of First Finance, arranged with the FDIC to purchase loans from the failed Easton State Bank. In conjunction with this purchase, he arranged for the Bank of White City to purchase the Easton loans from First Finance.[2] In turn, the Bank of White City gave Haddock a $250,000 cashier's check as a "downpayment on exclusive purchase rights" for the Easton loan package. Haddock did not apply the $250,000 check toward the purchase of the Easton loans. The government presented evidence that Haddock instead used approximately $200,-000 to fund his personal portion of the capital injection into the Bank of Herington, related to the bank's purchase of the failed First National Bank of Herington. He used the remainder to fund the purchase of a personal residence. Haddock later repaid the $250,000 to the Bank of White City.[3] The jury returned a guilty

1. Trial evidence indicated that the $611,000 in the account was the net proceeds of a loan to Herington Bancshares from Merchant's National Bank of Topeka, Kansas. Haddock had negotiated this loan in order to fund part of the required capital injection into the Bank of Herington. The evidence at trial shows that Herington Bancshares shareholders were to fund the remainder of the required injection. Haddock's personal share of the injection amount was approximately $200,000. The evidence shows that, by April 15, Haddock had funded his portion of the injection from the $250,000 received from the Bank of White City as a downpayment for the purchase of the Easton loan package—which is the subject of Count 3.

2. The evidence at trial indicated that First Finance and Bank of White City previously had worked together to purchase FDIC loans. Counsel for Haddock introduced evidence and argued that Haddock had disclosed to bank regulatory officials and to the boards of the Bank of Herington and the Bank of White City that he intended to form First Finance and to use it as a vehicle for purchasing loans from the FDIC.

3. According to the testimony of FDIC examiner Byron Lange, Haddock repaid the $250,000 by using a portion of the proceeds of a $711,000 loan from Kaw Valley State Bank—which is the subject of Count 4.

verdict on Count 3, which charged Haddock with executing a scheme to defraud the bank in violation of 18 U.S.C. § 1344.

On May 4, 1987, Kaw Valley State Bank loaned First Finance $711,000. The government presented evidence that Haddock represented to the bank in a signed affidavit that the loan proceeds would be used to purchase the Easton loan package. The bank requested this affidavit because First Finance pledged the Easton loans as collateral against the $711,000 loan, and the bank desired to have a purchase money security interest in the loans. In addition, Haddock showed Kaw Valley representatives a copy of a $866,344.44 check that First Finance purportedly had tendered to the FDIC to purchase the Easton loans. Officers from Kaw Valley State Bank testified that they understood that First Finance would use the loan proceeds to partially fund payment of the $866,344.44 check. In fact, the evidence at trial indicated that the check was never presented to the FDIC. The check stub in First Finance's checkbook indicated that the check was void; the original was never located. Despite Haddock's representations to Kaw Valley State Bank, $250,000 of the loan proceeds were used to refund the Bank of White City's downpayment for rights to purchase the Easton loan package. First Finance advanced another $55,000 to Haddock. First Finance did use $403,408.66 of the loan proceeds to make the first of two payments for the Easton loans to the FDIC on May 1, 1987. First Finance issued a $473,068.88 check to the FDIC on June 19, 1987 to fund the remainder of the purchase.[4] The jury returned a guilty verdict on Count 4, which charged Haddock with executing a scheme to defraud Kaw Valley State Bank under 18 U.S.C. § 1344.

After refunding the Bank of White City's $250,000 downpayment, First Finance (represented by Haddock) entered into a new agreement with the Bank of White City on June 24, 1987, whereby the Bank of White City gave First Finance $350,000 as a "downpayment" for exclusive rights to purchase the Easton loans. However, trial evidence indicated that Haddock had already received these loans from the FDIC and had pledged them to Kaw Valley State Bank as collateral for the $711,000 loan that is the subject of Count 4. Haddock and First Finance then used this $350,000 to fund a portion of the second installment to the FDIC for purchase of the Easton loan package. Count 5 charged Haddock with executing a scheme to commit fraud on the Bank of White City in violation of 18 U.S.C. § 1344; the jury returned a guilty verdict on this count.

When Haddock, on behalf of First Finance, applied for the $711,000 loan from Kaw Valley State Bank, he gave the bank a copy of his personal financial statement. At trial, the government presented evidence that the financial statement did not list a $10,000 debt owed by Haddock to First Finance and did not disclose that First Finance had extended a $350,000 open line of credit to Haddock. When Haddock gave the financial statement to Kaw Valley's president, he had not yet drawn on the line of credit. However, he received $303,947.05 from First Finance on this line of credit two days after the date of the financial statement. Count 2 charged Haddock with making a false statement to Kaw Valley State Bank in violation of 18 U.S.C. § 1014. The jury returned a guilty verdict.

*Acquisition of the Nortonville Loan Package*

In October of 1987, First Finance entered an agreement to purchase the "Nortonville Loan Package," consisting of twenty-nine loans, from the FDIC. In conjunction with this purchase, the Bank of White City gave Haddock a $273,500 check—payable to the FDIC—to be used to purchase the Nortonville loan package. At trial, counsel for Haddock argued that the Bank of White City did not know how many of the loans it would receive and that Haddock and the bank's president were to decide later which

---

**4.** The trial evidence, comprised primarily of exhibits prepared by and testimony given by FDIC examiner Byron Lange, showed that this $473,068.88 payment was funded partially by a $350,000 down payment check from the Bank of White City (Count 3) and partially by a $103,000 check that Haddock wrote on his personal account at the Bank of Herington.

loans the bank would purchase. To the contrary, the government presented evidence that the Bank of White City and Haddock understood that the bank was to receive all of the Nortonville loans. The Bank of White City received only twelve of the twenty-nine Nortonville loans.[5] Haddock pledged the remaining loans as collateral for a $94,000 loan to First Finance from Kaw Valley State Bank. Count 6 charged Haddock with executing a scheme to defraud the Bank of White City in violation of 18 U.S.C. § 1344. The jury returned a guilty verdict on this count.

The government also presented evidence that Kaw Valley State Bank made the $94,000 loan to First Finance on October 30, 1987 based on Haddock's representation that the bank would have a security interest in the entire Nortonville loan package. Haddock gave Kaw Valley State Bank a copy of a First Finance check for $200,000, which he represented was used to purchase the Nortonville loan package from the FDIC. Robert Maxwell, an officer at Kaw Valley State Bank, testified that, at the time of the loan, he understood that the Nortonville loans were purchased with the proceeds of the $94,000 loan and with First Finance funds.[6] He indicated that he was unaware that any other financial institution was involved. The check stub related to this check's number in First Finance's checkbook was marked "void." FDIC examiner Byron Lange testified that payment for the Nortonville loan package did not come from a First Finance check, but from a Bank of White City check in the amount of $273,500. The jury returned a guilty verdict on Count 7, which charged Haddock with executing a scheme to defraud Kaw Valley State Bank.

*Acquisition of the Galena Loan Package*

Later in 1987, Haddock arranged to purchase the "Galena Loan Package" from the FDIC, which then was to be sold to the Bank of White City. On December 9, 1987, the Bank of White City issued a $50,000 check, payable to First Finance. Dave Farres, president of the Bank of White City, testified that he understood the $50,000 to be a downpayment for the purchase of the Galena loans. According to FDIC examiner Byron Lange, Haddock also told the FDIC that the $50,000 was used to purchase the Galena loans. However, First Finance used the $50,000 to fund part of a $150,000 loan payment to Kaw Valley State Bank. Count 8 charged Haddock with misapplication of this $50,000 in violation of 18 U.S.C. § 656; the jury returned a guilty verdict.

On December 11, 1987, the Bank of White City issued another check, in the amount of $70,766.45 and payable to the FDIC, to pay the balance of the purchase price for the Galena loan package. Farres testified that he understood that the total cost of the Galena loan package was $95,766.45; Haddock gave an asset sale agreement to Farres which reflected that figure. The total of the two checks issued by the Bank of White City was $120,766.45. Farres testified that he understood that the $25,000 difference between the amount paid to First Finance and the purported $95,766.45 cost of the Galena loan package was to be retained by First Finance as a "servicing fee." In fact, First Finance paid only $70,766.45 for the Galena loan package, not $95,766.45 as represented by Haddock to the Bank of White City. Count 9 alleged these facts and charged Haddock with executing a scheme to defraud the Bank of White City in violation of 18 U.S.C. § 1344. The jury returned a guilty verdict on Count 9.

*FDIC Examination*

During an FDIC investigation, FDIC examiner Byron Lange and his assistants reviewed First Finance's checkbook on May

---

**5.** Haddock actually repurchased from the Bank of White City two of these twelve loans for $92,000 because the bank determined that the two loans were of a low quality and potentially could be classified by FDIC examiners.

**6.** The evidence at trial indicated that Haddock did not apply the proceeds of the $94,000 loan toward the purchase of the Nortonville loans from the FDIC. Instead, he used most of the proceeds to fund a $92,000 check to the Bank of White City for repurchase of two of the twelve Nortonville loans that were forwarded to the Bank of White City.

26, 1987 and then returned it to Haddock. The next day, Lange again reviewed the checkbook. At trial, he testified that some of the checkstubs had been altered since the time of his initial review. These changes included alterations to deposits made to the First Finance checking account and elimination of substantial overdrafts during April and May of 1987.[7] The jury returned a guilty verdict on Count 10, which charged Haddock with concealing relevant information from the FDIC in violation of 18 U.S.C. § 1007.

## DISCUSSION

### I. Indictment Defect and Ex Post Facto Clause Claim

Count 10 of the indictment charged the defendant with "knowingly and intentionally mak[ing] or invit[ing] reliance on a false, forged, or counterfeit statement, document or thing," namely the "altered checkbook of First Finance, Inc." This count tracks the language of 18 U.S.C. § 1007 as amended in 1989. Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, § 961(f), 103 Stat. 500.[8] However, the conduct alleged in Count 10 occurred during 1988, before Congress amended the statute.

Haddock argues that the conduct alleged in Count 10 was not within the scope of the prohibitions of § 1007 until after the 1989 amendment. He further asserts that because the indictment tracks the language of the 1989 amended version of the statute, the indictment fails to charge an offense that existed when the alleged conduct occurred and, therefore, the conviction violated the Ex Post Facto Clause of the Constitution.

■ Haddock did not object to the language of the indictment prior to trial. Instead, he raised the ex post facto claim both in his post-trial motion of February 19, 1991 and again on this appeal. Although most objections to an indictment are waived if not raised before trial, an indictment's failure to state an offense is a defect that may be raised at anytime, including on appeal. *United States v. Freeman*, 813 F.2d 303, 304 (10th Cir.1987). However, "the countervailing interest in judicial efficiency requires that tardily-challenged indictments be construed liberally in favor of validity." *Id.*

We have stated that "[a]n indictment is not insufficient merely because it fails to recite the precise language of the statute." *United States v. Poole*, 929 F.2d 1476, 1479 (10th Cir.1991). An indictment is generally sufficient "if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend, and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense." *United States v. Staggs*, 881 F.2d 1527, 1530 (10th Cir.1989) (citing *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974)). We must look to the allegations in the indictment to determine whether it adequately states the elements of an offense. *Id.*

■ A violation of the 1988 version of § 1007 required that a defendant 1) make any statement, 2) knowing it to be false, 3) for the purpose of obtaining a loan from the FDIC or otherwise influencing actions of the FDIC.[9] Count 10 of the indictment reads in part as follows:

---

7. In particular, Lange testified that several of the alterations were related to the deposit of loan proceeds of the $711,000 loan from Kaw Valley State Bank (Count 4) and to the deposit of the $250,000 received from the Bank of White City (Count 3).

8. As amended on August 9, 1989, 18 U.S.C. § 1007 provides, in relevant part, the following: Whoever, for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation, knowingly makes or invites reliance on a false, forged, or counter-

feit statement, document or thing shall be fined....

9. The 1988 version of section 1007, in force prior to the 1989 amendment, provided in pertinent part that "[w]hoever, for the purpose of obtaining any loan from the Federal Deposit Insurance Corporation ... or for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation, makes any statement, knowing it to be false, ... shall be fined...." 18 U.S.C. § 1007 (1988).

On or about May 26, 1988, ... KENNETH E. HADDOCK for the purpose of influencing the actions of the Federal Deposit Insurance corporation, did knowingly and intentionally make or invite reliance on a false, forged, or counterfeit statement, document or thing; that is, during an audit by Federal Deposit Insurance Corporation of the books and accounts of First Finance, Inc., an affiliate of the Bank of White City and the Bank of Herington, the defendant did alter or caused to be altered the checkbook of First Finance, Inc., to conceal from Federal Deposit Insurance Corporation examiners payees of checks, dates of deposits, and balances of the First Finance Inc. checking account, and to conceal other facts relevant to the audit, all in violation of Title 18, United States Code, Section 1007.

The indictment clearly states that Haddock acted knowingly and with the purpose of influencing actions of the FDIC during the FDIC's investigation of charges related to this case. The only remaining question is whether Haddock's alleged conduct constitutes a "statement."

The indictment charges Haddock with "alter[ing] or caus[ing] to be altered" First Finance's checkbook to conceal payees, deposit dates, balances, and other facts relevant to the FDIC's audit. Citing *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), Haddock argues that the alleged alterations do not constitute a "statement." In *Williams*, the Supreme Court—reviewing the applicability of 18 U.S.C. § 1014 to a check kiting scheme—held that the writing of a check does "not involve the making of a 'false statement' " because a check does not "make any representation as to the state of [the customer's] bank balance." *Id.* at 284–85, 102 S.Ct. at 3091. We cannot extend the reasoning of *Williams* to support Haddock's assertion that alterations made to selected check stubs in First Finance's checkbook do not constitute "statements." These alterations were made during an FDIC investigation of which appellant was fully aware. The indictment alleges that they were made in order to hide the truth about payees, account balances, and deposit dates. The alterations—as alleged—clearly represent an attempt to communicate something different to the FDIC than what the FDIC might have found had it reviewed the checkbook without the alterations. Therefore, we conclude that the conduct alleged in the indictment does include a "statement" as contemplated by the language of the pre-amendment version of § 1007.

■ Because the indictment alleges each of the elements required for a violation under the 1988 version of § 1007, we conclude that the indictment adequately apprised Haddock of the charges against which he needed to defend. *See United States v. Chestnut*, 533 F.2d 40, 44–45 (2d Cir.) (indictment sufficiently charged an offense even though it used language from the wrong version of the statute), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976); *United States v. Cohen*, 450 F.2d 1019, 1020–21 (5th Cir.1971) (same).[10] We also conclude that the indictment's charging language, viewed in tandem with the record, is sufficiently specific and descriptive that Haddock may "subsequently avail himself of the form of jeopardy for future prosecution of the same offense." *United States v. Bullock*, 914 F.2d 1413, 1414 (10th Cir.1990). Furthermore, because the conduct alleged in the indictment constitutes an offense under the pre-amendment version of § 1007, we reject Haddock's ex post facto argument that the indictment failed to charge an offense that existed when the alleged conduct occurred.

---

10. The legislative history of the 1989 amendment to § 1007 demonstrates that Congress intended that acts that were criminal under pre-amendment § 1007 would continue to be criminal after enactment of the amendment:

Section 961(f) condenses the language of 18 U.S.C. 1007 without altering the content. Section 961(f) also expands 1007 to cover all fraudulent conduct regarding Federal Deposit Corporation transactions (presently dealt with in 18 U.S.C. 1008).

H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 399 (1989), *reprinted in* 1989 U.S.Code Cong. & Admin.News 86, 196.

Haddock argues that the district court erred by refusing to address the alleged indictment defect (including the Ex Post Facto Clause claim) when it was raised in Haddock's post-trial motion of February 19, 1991. Because an indictment's failure to state an offense is a defect that may be raised at any time, *Freeman*, 813 F.2d at 304, and Haddock's ex post facto argument implicates this very defect, the district court had jurisdiction to address the claim because it was raised before defendant filed a notice of appeal to this court. However, because we hold that the language of the indictment is not violative of ex post facto principles, we conclude that the district court's error in failing to address the claim was harmless.

## II. Defendant's Second Motion for New Trial

The jury returned the verdict in this case on December 10, 1990. On December 13, Haddock filed a timely motion for new trial under Federal Rule of Criminal Procedure 33. That motion did not raise the Ex Post Facto Clause and ineffective assistance claims that Haddock argues on appeal. On February 7, 1991, the court entered an order denying Haddock's motion for new trial. On February 11, Haddock—represented by new counsel—filed a motion for leave to supplement his motion for new trial and to extend the time for filing his motion for new trial. On February 19, Haddock filed a motion for a judgment of acquittal, or, in the alternative, to arrest judgment and for a new trial. In this motion, Haddock asserted additional grounds to justify a new trial, including that his conviction under Count 10 violated the Ex Post Facto Clause and that he was denied his Sixth Amendment right to effective assistance of counsel. Based on the rationale that it lacked jurisdiction to grant either motion, the district court denied both of these motions.

On appeal, defendant argues that the district court erred in holding that it lacked jurisdiction to consider and grant these two motions. We review de novo a district court's determination that it had no jurisdiction to address a party's motion or claim. *See Walden v. Bartlett*, 840 F.2d 771, 772–73 (10th Cir.1988).

Haddock contends that, under *United States v. Miller*, 869 F.2d 1418 (10th Cir.1989), the district court had jurisdiction to consider the two motions. In *Miller*, we held that "a *motion to reconsider the denial of a new trial* under Fed.R.Crim.P. 33 is timely if filed within ten days of the entry of judgment or order." *Id.* at 1421 (emphasis added). In this case, however, neither of defendant's motions—dated February 11 and February 19—was tantamount to a *motion to reconsider* the court's denial of the initial motion for new trial. Instead, the two motions were an attempt to have the court consider a new motion for new trial that asserted numerous grounds not asserted in the original new trial motion. Rule 33 clearly states that a motion for new trial not based on newly discovered evidence must be filed within seven days after a jury's verdict. Fed.R.Crim.P. 33. Because these two motions were filed some two months after the jury's verdict, we agree with the district court that they were not timely under Rule 33.

Haddock also argues that the district court had jurisdiction to hear his ineffective assistance of counsel claim even though the claim was not raised in a motion for new trial within seven days after the verdict. He asserts that evidence of the ineffectiveness of trial counsel should be considered "newly discovered evidence" under Rule 33, thereby allowing a defendant to raise the claim in a new trial motion any time within two years after the verdict. Although Haddock correctly points out that the circuits are split over the issue, he fails to note that in *United States v. Miller*—a case that he cites elsewhere in his brief—we held that "[i]neffective assistance of counsel may not serve as the basis for a motion for a new trial on the ground of newly discovered evidence under Rule 33 where the facts alleged in support of the motion were within the defendant's knowledge at the time of trial." 869 F.2d at 1421. All other circuits except one that

have addressed the issue have arrived at the same conclusion. *See United States v. Seago,* 930 F.2d 482, 488–89 (6th Cir.1991); *United States v. Lema,* 909 F.2d 561, 565 (1st Cir.1990); *United States v. Ugalde,* 861 F.2d 802, 806 (5th Cir.1988), *cert. denied,* 490 U.S. 1097, 109 S.Ct. 2447, 104 L.Ed.2d 1002 (1989); *United States v. Brown,* 742 F.2d 363, 368 (7th Cir.1984); *United States v. Dukes,* 727 F.2d 34, 39 (2d Cir.1984); *United States v. Lara–Hernandez,* 588 F.2d 272, 275 (9th Cir.1978). *But see United States v. Brown,* 476 F.2d 933, 935 n. 11 (D.C.Cir.1973). Based on *Miller,* we hold that Haddock's ineffective assistance claim was not raised in a timely motion for new trial.

Haddock further argues that the jurisdictional bar imposed by Rule 33 should not apply to his second motion for new trial because the motion refers to facts not known to him at the time of trial. We disagree. The claim of ineffective assistance of counsel in this case was that counsel failed to raise several legal defenses, failed to effectively cross-examine witnesses, and generally failed to perform effectively at trial. These facts, related to the adequacy of counsel's trial performance, were available to defendant at the time of trial. *See Miller,* 869 F.2d at 1422.

■ Haddock contends that even if the ineffective assistance of counsel claim does not survive the jurisdictional bar of Rule 33, we should not dismiss this action but instead remand the case to allow him to collaterally attack the conviction pursuant to 28 U.S.C. § 2255. We find no basis—and defendant provides us with none—for his request that we remand the case for collateral attack on these grounds. Haddock must seek collateral review of the conviction in a separate action.

The district court's failure to address defendant's Ex Post Facto Clause claim was harmless error. With respect to the remainder of the arguments raised in defendant's post-trial motions of February 11 and February 19, we affirm the district court's dismissal of the motions as untimely under Rule 33.

## III. Exclusion of Documents from Evidence

■ At trial and outside the jury's presence, counsel for Haddock proffered photocopies of six documents as evidence supporting Haddock's defense. The district court denied admission of these photocopies into evidence on the basis that "they did not have enough indication of reliability at this time that the court felt that [it] could allow them under the Rules of Evidence." In a memorandum reexamining that order, the court concluded that "the government had raised a genuine issue as to the authenticity of the originals." Defendant contends that these documents were admissible under the Federal Rules of Evidence and that the exclusion of these documents violated his Fifth Amendment and Sixth Amendment right to present evidence in his defense. The trial court is afforded broad discretion in making evidentiary rulings, and we reverse only upon a showing of abuse of that discretion. *United States v. Alexander,* 849 F.2d 1293, 1301 (10th Cir.1988).

Under Rule 1001(4) of the Federal Rules of Evidence, photocopies are considered duplicates. Rule 1003 provides that "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Fed.R.Evid. 1003. Rule 1003 is part of a broadened set of evidentiary rules that reflect the fact that, due to modern and accurate reproduction techniques, duplicates and originals should normally be treated interchangeably. However, despite our age of technology, a trial court must still be wary of admitting duplicates "where the circumstances surrounding the execution of the writing present a substantial possibility of fraud." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 1003[02], at 1003–9 (1991).

With regard to each of these photocopies, evidence presented at trial indicates that only Haddock could recall ever seeing either the original or a copy of these documents. Except for Haddock, no one—

including in some cases persons who allegedly typed the document and persons to whom the original allegedly was sent—was familiar with the contents of the photocopies. In addition, witnesses testified that several of the documents bore markings and included statements that did not comport with similar documents prepared in the ordinary course of business at the Bank of White City and at the Bank of Herington. Under these circumstances, we hold that the district court did not abuse its discretion by excluding these photocopied documents from evidence.

### IV. Jury Instructions

### A. Multiplicity and Duplicity

Haddock contends that the indictment—which was read to the jury as part of the court's instructions—was both multiplicitous and duplicitous. From the record, it appears that Haddock may have waived these objections to the indictment's language. However, even if he did not waive them, we hold that the indictment was neither multiplicitous nor duplicitous.

 An indictment is multiplicitous if it charges a single offense in more than one count. If multiplicitous, an indictment may lead to multiple sentences for the same conduct and may suggest to the jury that the defendant committed more than one crime. *See United States v. Dixon*, 921 F.2d 194, 196 (8th Cir.1990). Duplicity, on the other hand, is joining two or more separate offenses in the same count. The vice of duplicity is that a jury may convict a defendant without unanimously agreeing on the defendant's guilt of the same offense. *See United States v. Saleh*, 875 F.2d 535, 537 (6th Cir.1989).

 In the instant case, Haddock's sole ground for claiming that the indictment was multiplicitous and duplicitous is that each count in the indictment states that "[t]he grand jury realleges the foregoing paragraphs." Haddock argues that such an incorporation by reference causes each offense to be charged in more than one count and causes each count to charge more than one offense. We disagree.

Each count of the indictment clearly describes separate conduct and charges a separate offense. In Instruction No. 7, the court specifically instructed the jury as follows:

> As you have noted, a separate crime or offense is charged in each of the counts of the Indictment. Each charge and the evidence pertaining to it should be considered separately. The fact that you may find the defendant guilty or not guilty on one of the offenses charged should not control your verdict as to any other offense charged.

Given the specificity of this instruction and the adequacy of the charging language in each count, we hold that each count's general incorporation language did not create the dangers associated with multiplicitous and duplicitous indictments.

### B. Failure to Instruct Jury on Defendant's Good Faith

 Haddock further contends that the district court erred by failing to instruct the jury on Haddock's good faith with regard to Counts 1, 2, 8 and 10. The government argues that Haddock has waived this objection as it relates to Counts 2 and 10 by not raising it prior to this appeal. The record reveals that Haddock's counsel tendered good faith instructions and objected to the court's failure to give good faith instructions only with regard to Counts 1 and 8. Because no objection was made to the lack of a good faith instruction with regard to Counts 2 and 10 prior to the jury's retirement, defendant has waived his right to so object. *United States v. Sanders*, 928 F.2d 940, 943 n. 2 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 142, 116 L.Ed.2d 109 (1991); *Lusby v. T.G. & Y. Stores, Inc.*, 796 F.2d 1307, 1311 (10th Cir.), *cert. denied*, 479 U.S. 884, 107 S.Ct. 275, 93 L.Ed.2d 251 (1986). Therefore, the only remaining question is whether the district court should have given a good faith instruction in connection with Counts 1 and 8, which involve violations of 18 U.S.C. § 656. When reviewing a challenge to jury instructions, "we review the record as a whole to determine whether the instructions 'state the law which governs and pro-

vided the jury with an ample understanding of the issues and the standards applicable.' " *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir.1988) (quoting *Ramsey v. Culpepper*, 738 F.2d 1092, 1098 (10th Cir.1984)).

▮ It is well-established that good faith is a legitimate theory of defense to violations of § 656. *See, e.g., United States v. Unruh*, 855 F.2d 1363, 1369–70 (9th Cir.1987), *cert. denied*, 488 U.S. 974, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988); *United States v. Steffen*, 641 F.2d 591, 596 (8th Cir.), *cert. denied*, 452 U.S. 943, 101 S.Ct. 3091, 69 L.Ed.2d 959 (1981). "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988); *United States v. Harting*, 879 F.2d 765, 767 (10th Cir.1989).

▮ The district court held that Haddock was not entitled to a separate good faith instruction because the specific instructions given on the meaning of the phrases "willfully misapplies" and "intent to injure or defraud" from § 656 sufficiently conveyed the essence of a good faith defense to the jury. Instruction No. 11 provided that "[t]he phrase 'willfully misapplies' means the unjustifiable or wrongful use of the monies, funds or credits of the bank. Willful misapplication means more than bad administration." The instruction further stated that "[t]he phrase 'with intent to injure or defraud the bank' means to act knowingly and with the intent to deceive or to cheat the bank—ordinarily for the purpose of either causing a finan-

cial gain or a financial loss to someone or something." In addition, we note that the court gave a separate good faith instruction on six other counts, but conspicuously did not include Counts 1 and 8—which charged violations of § 656—within the scope of that instruction.

In this circuit, we have held that general instructions on willfulness and intent are insufficient to fully and clearly convey a defendant's good faith defense to the jury. *United States v. Mann*, 884 F.2d 532, 536–37 (10th Cir.1989) (good faith instruction under 26 U.S.C. § 7203, willful failure to file income tax returns); *United States v. Harting*, 879 F.2d at 767 (same); *United States v. Hopkins*, 744 F.2d 716, 718 (10th Cir.1984) (en banc) (good faith instruction under 18 U.S.C. § 1341, mail fraud); *accord United States v. Casperson*, 773 F.2d 216, 223–24 (8th Cir.1985); *see also United States v. Ratchford*, 942 F.2d 702, 706–07 (10th Cir.1991) (under 18 U.S.C. § 657 [fraud on lending, credit and insurance institutions], there was no error in good faith instruction that defendant acting upon "honest opinion or belief is not chargeable with fraudulent intent even if his opinion is erroneous or his belief is mistaken or wrong"). We also have held that failure to give an adequate good faith instruction is reversible error provided "the evidence is sufficient such that a reasonable jury could believe" the defendant's good faith defense. *Harting*, 879 F.2d at 768. Based on clear precedent in this circuit, we hold that because the instructions in this case did no more than define "willfulness" and "intent to injure or defraud" under § 656, they did not adequately convey Haddock's good faith defense to the jury.[11] Therefore, we turn to the question of whether

11. In holding that Instruction 11 adequately submitted Haddock's good faith theory of defense to the jury, the district court relied on authority from several other circuits that have found that complete instructions on willfulness and intent to defraud state the "essence of a good faith instruction." *See United States v. McElroy*, 910 F.2d 1016, 1026 (2d Cir.1990); *United States v. Nivica*, 887 F.2d 1110, 1124–25 (1st Cir.1989) (citing *New England Enterprises, Inc. v. United States*, 400 F.2d 58, 71 (1st Cir. 1968)), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1990); *United States v. Gunter*,

876 F.2d 1113, 1118–20 (5th Cir.), *cert. denied*, 493 U.S. 871, 110 S.Ct. 198, 107 L.Ed.2d 152 (1989); *United States v. Alcantar*, 832 F.2d 1175, 1179 (9th Cir.1987); *United States v. McGuire*, 744 F.2d 1197, 1201–02 (6th Cir.1984), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 159 (1985); *United States v. Gambler*, 662 F.2d 834, 837 (D.C.Cir.1981). Despite the contrary position taken by most other circuits that have addressed the issue, we are constrained by the precedent in this circuit to hold that the instructions in this case were inadequate to state Haddock's good faith theory of defense to the jury.

the evidence is such that a reasonable jury could believe Haddock's good faith defense.[12]

■■■ Count 1 charges Haddock with presenting a check written on a First Finance account that he knew was short of funds by approximately $350,000. The account remained without sufficient funds between April 3, 1987 and April 15, 1987. At trial, Haddock testified that he relied on a representation by Patricia Fells—then an officer at the Bank of Herington—that the account contained sufficient funds to cover the check. He stated that he was not aware of a shortage of funds until long after April, 1987. In addition, Fells testified that the books at the Bank of Herington were not regularly balanced between April 3 and April 15 and that business at the bank was a "nightmare" due to the bank's acquisition of the failed First National Bank of Herington. She also suggested that Haddock would have put money into the account before April 15 had the lack of funds been brought to his attention.

Count 8 charges Haddock with misapplying $50,000 of funds forwarded by the Bank of White City to First Finance so that First Finance could make a down payment toward the purchase of the Galena loan package. At trial, evidence was introduced that Haddock instead used the money to make a loan payment on an unrelated loan at Kaw Valley State Bank. However, Haddock testified at trial that the $50,000 check given by the Bank of White City to First Finance had nothing to do with the purchase of the Galena loans. He testified that $25,000 of the money was to be placed into an escrow account and to be forwarded to First Finance as the Bank of White City received additional loans. He further testified that both entities agreed that First Finance could use the remaining $25,000 however it wished.

Based on this evidence related to Counts 1 and 8, we hold that Haddock was entitled to a good faith instruction in relation to those counts. Therefore, we reverse the convictions on Counts 1 and 8 and remand for new trial on those counts.

## V. Variance Between Indictment and Evidence at Trial

A variance between an indictment and proof at trial occurs "when 'the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *Hunter v. New Mexico*, 916 F.2d 595, 598 (10th Cir.1990) (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir.1986)), *cert. denied*, —— U.S. ——, 111 S.Ct. 1693, 114 L.Ed.2d 87 (1991). When such a variance occurs, " 'convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment.'" *Id.* at 599 (quoting *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985)). A variance "is fatal only when the defendant is prejudiced in his defense because he cannot anticipate from the indictment what evidence will be presented against him or is exposed to the risk of double jeopardy." *Id.*

■■■ On appeal, Haddock seems to argue two different "variances." He first contends that although the indictment charged Haddock "with violating policies and laws prohibiting conflicts of interest," evidence at trial showed that he made proper disclosures and abstained from voting so that he did not commit such violations. We note that this alleged error is not in the nature of a "variance" as described in our cases because—as Haddock's argument concedes—the indictment warned Haddock

---

**12.** At trial and on appeal, Haddock has argued and presented evidence that he made proper disclosures to regulatory officials and to the Boards of Directors of the Bank of Herington and the Bank of White City before he formed First Finance and used it as the vehicle for purchasing loan packages from the FDIC. He asserts that the evidence of these disclosures was sufficient to support a good faith instruc-

tion to the jury. Although these disclosures might be evidence of Haddock's good faith in establishing First Finance and in making appropriate arrangements for First Finance to be an intermediary in the purchase of loans from the FDIC, they are not evidence relevant to Haddock's good faith related to the alleged violations of § 656.

of the need to defend against conflict-of-interest accusations. Furthermore, after reviewing the indictment's language, we conclude that the few references to Haddock's conflict-of-interest responsibilities did not substantially prejudice his rights.[13]

■ Haddock also contends that the government argued at trial that Haddock violated conflict-of-interest rules. This argument is more in the nature of a "variance" argument because the indictment's charging language does not refer to such violations. However, after reviewing the record, we conclude that the few innocuous references related to conflict-of-interest rules were closely related to the charges in Counts 3 and 5 that Haddock engaged in a scheme to defraud the Bank of White City. Therefore, we conclude that the evidence at trial did not prove facts materially different from those alleged in the indictment.

## VI. Sufficiency of the Evidence

Haddock challenges the sufficiency of the evidence to sustain his conviction on Counts 1, 2, 3, 5, and 9. Because we reverse Haddock's conviction on Count 1 and remand for new trial on that count, we do not consider whether evidence was sufficient to convict on that count. " 'Evidence is considered sufficient to support a criminal conviction if, when viewed in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.' " *United States v. Ratchford,* 942 F.2d 702, 703 (10th Cir.1991) (quoting *United States v. Culpepper,* 834 F.2d 879, 881 (10th Cir. 1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979))).

## Count 2

Count 2 charged Haddock with making a false statement in violation of 18 U.S.C. § 1014 to Kaw Valley State Bank when Haddock negotiated with the bank to ob-

tain a $711,000 loan. In particular, the count alleges that Haddock failed to list two items on Haddock's personal financial statement requested by the bank. The financial statement did not list a $10,000 debt from First Finance to Haddock and did not list a $350,000 open line of credit from First Finance to Haddock, both of which allegedly were outstanding on April 1, 1987—the date Haddock filled out the form financial statement at Kaw Valley State Bank.

■ The essential elements of a § 1014 violation are 1) that defendant made a false statement to a bank; 2) that he or she did so for the purpose of influencing the bank's action; 3) that the statement was false as to a material fact; and 4) that the defendant made the false statements knowingly. *United States v. Smith,* 838 F.2d 436, 439 (10th Cir.1988), *cert. denied,* 490 U.S. 1036, 109 S.Ct. 1935, 104 L.Ed.2d 407 (1989).

### A. Failure to List the Line of Credit

■ At trial, the government presented evidence—a resolution of First Finance dated February 13, 1987 (Government's Exhibit 3)—indicating that First Finance already had extended Haddock the $350,000 line of credit at the time he completed his financial statement on April 1, 1987. Haddock testified at trial that the line of credit did not exist on April 1, but that he had created Exhibit 3 after April 1 and had backdated the resolution. On appeal, Haddock no longer contends that the line of credit did not exist on April 1; instead, he now contends that failure to list a line of credit that had not yet been drawn upon is not a material, false statement as required by § 1014.

By returning a verdict of guilty on Count 2, the jury could have discredited Haddock's testimony that the line of credit was created after April 1, 1987 and was then

---

**13.** Introductory paragraph 10 of the indictment states that "defendant KENNETH E. HADDOCK, as a Director, Officer and person affiliated with federally insured institutions, had an obligation to operate the institutions safely, prudently and free of any fraud, conflict of interest, or self-dealing." Paragraph 6 also explains in some detail Haddock's relationship to the Bank of Herington, the Bank of White City, and Herington Bancshares, as well as the fact that he was incorporator, sole shareholder, president and secretary of First Finance, Inc.

backdated to February 13, 1987. The jury's perception of Haddock's testimony regarding the existence of the line of credit also could have influenced its determination of whether Haddock knowingly concealed the line of credit in order to obtain the $711,000 loan from Kaw Valley State Bank. In addition, based on evidence presented at trial regarding Haddock's position as president and chairman of the board of two different banks, the jury could have concluded that Haddock was aware that the existence of a $350,000 line of credit was germane to his creditworthiness. The form financial statement Haddock filled out clearly requested a complete disclosure of Haddock's financial position. We have reviewed the statement and conclude that the category entitled "Contingent Liabilities—Other special debt" is a point at which a reasonable jury could have concluded that Haddock should have listed an open line of credit that was material to his financial position. Under these circumstances, viewing the evidence in the light most favorable to the government, we conclude that a reasonable jury could have found beyond a reasonable doubt that Haddock knew that the line of credit was relevant to his financial position and, therefore, that failure to disclose the line of credit was equivalent to a knowingly false statement.

### B. Failure to List the $10,000 Loan

■ Count 2 also alleges that Haddock failed to list on his personal financial statement a $10,000 loan that he had received from First Finance. At trial, Haddock testified that he had simply forgotten to list the outstanding loan. On appeal, Haddock contends that his failure to list the $10,000 loan was not material. To support this contention, Haddock points to the trial testimony of Gerald Lauber, President of Kaw Valley State Bank. Lauber testified that he "might view" the $10,000 loan to be "a wash" because the $10,000 loan to Haddock was from First Finance, a corporation of which Haddock owned 100% of the stock. Lauber also testified that inclusion of the $10,000 loan in the financial statement "would not have had a significant bearing"

on the decision to make the loan. We also note that, at another point in the cross-examination by defendant's counsel, Lauber testified that "if Mr. Haddock had an obligation to another entity, it should have been on the financial statement."

■ In the context of other false statements statutes, we have held that materiality is a question of law to be determined by the court. *United States v. Daily*, 921 F.2d 994, 1004 (10th Cir.1990) (18 U.S.C. § 1001, false statements as to matters within jurisdiction of a federal agency), *cert. denied*, —— U.S. ——, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991); *United States v. Vap*, 852 F.2d 1249, 1253–54 (10th Cir.1988) (18 U.S.C. § 1623, perjury before a grand jury); *United States v. Masters*, 484 F.2d 1251, 1254 (10th Cir.1973) (18 U.S.C. § 1621, general perjury statute). Likewise, we hold that materiality under 18 U.S.C. § 1014 is a question of law. *See United States v. Shriver*, 842 F.2d 968, 976–77 (7th Cir.1988); *United States v. Ryan*, 828 F.2d 1010, 1018 (3d Cir.1987).

Also in the context of another false statements statute, "[w]e have defined materiality as a natural tendency to influence, or the capability of influencing" a decision maker. *Daily*, 921 F.2d at 1003 n. 9. Actual reliance by Kaw Valley State Bank on defendant's omission of the $10,000 loan need not be shown to meet the materiality requirement under § 1014; instead, we must only determine whether omission of the loan had the capacity to influence the bank's decision. *See Shriver*, 842 F.2d at 976 n. 11 ("reliance and materiality are not the same thing § 1014"; capacity to influence is the correct test); *Theron v. United States Marshal*, 832 F.2d 492, 497 (9th Cir.1987) ("A statement concerns a material fact when the statement has the capacity to influence the lending decision."), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988); *United States v. McGee*, 831 F.2d 670, 671 (6th Cir.1987) (statement is material if it has "the capacity to influence a reasonable lender"); *Ryan*, 828 F.2d at 1018 ("it is enough that the statement is of a type that could dis-

turb the balance of facts that would otherwise be available to the bank").

A loan in the amount of $10,000 is significant information that a bank normally would expect to evaluate with other financial information provided by a loan applicant. In addition, we note that we do not evaluate the materiality of the $10,000 loan from First Finance to Haddock in a vacuum; instead, we look at the materiality of the loan in the context of other relevant evidence. The government presented evidence, and the jury could have found, that Haddock also failed to list a $350,000 line of credit extended by First Finance to Haddock. Because the loan was made to First Finance and because the bank relied on the strength of Haddock's personal financial position, the frequent transfer of funds from First Finance to Haddock certainly was relevant to a complete evaluation of First Finance's creditworthiness by the bank. Under these circumstances, existence of the $10,000 loan from First Finance to Haddock had the capacity to influence the bank by "disturb[ing] the balance of facts that would otherwise be available to the bank." *Ryan,* 828 F.2d at 1018.[14] We conclude that the $10,000 loan is legally material under § 1014.

■■■■■ Haddock also argues that the evidence related to omission of the $10,000 loan was insufficient to support the guilty verdict on Count 2. Failure to list outstanding loans on a form financial statement or loan application constitutes a false statement under § 1014. *Robinson v. United States,* 345 F.2d 1007, 1009–10 (10th Cir.), *cert. denied,* 382 U.S. 839, 86 S.Ct. 87, 15 L.Ed.2d 81 (1965); *see also Theron,* 832 F.2d at 497; *United States v. Stephens,* 779 F.2d 232, 237 (5th Cir.1985). Having reviewed the record thoroughly and viewing the evidence in the light most favorable to the government, we conclude that a reasonable jury could have found beyond a reasonable doubt that Haddock knowingly omitted the $10,000 loan from

his financial statement with the purpose of influencing the bank's actions.

## Count 3

■■■■ Count 3 charges Haddock with executing a scheme to defraud the Bank of White City in violation of 18 U.S.C. § 1344. The count alleges that the Bank of White City gave Haddock (on behalf of First Finance) a $250,000 cashier's check in relation to the purchase of the Easton loan package. Undisputed evidence shows that a notation on the cashier's check stated that the money was a "downpayment on exclusive purchase rights." The count further alleges that instead of applying the funds to the purchase of the Easton loans, Haddock put $200,848.81 into the Herington Bancshares checking account on April 15, 1987 to cover a portion of the overdraft that is the basis of the charges in Count 1 and that Haddock used the remaining approximately $50,000 to fund the purchase of a personal residence. The parties do not dispute that Haddock eventually repaid $250,000 to the Bank of White City.

To prove a violation of § 1344, the government must prove that the defendant knowingly executed, or attempted to execute, a scheme or artifice either to defraud a financial institution or to obtain moneys or other property owned by a financial institution by means of false or fraudulent pretenses, representations, or promises. 18 U.S.C. § 1344. On appeal, Haddock argues that the evidence is conflicting as to whether he agreed to apply the $250,000 toward the purchase of the Easton loan package. Haddock also contends that the Bank of White City put no stipulation on the use of that $250,000 payment and that he was entitled to assume that he could use the money in any way he pleased.

At trial, the government introduced evidence that the $250,000 cashier's check contained the notation, "for the down payment on exclusive purchase rights." In addition, the government introduced a commitment letter that reads in part as follows:

regard the separateness between Haddock, an individual, and First Finance, a corporate entity, that Haddock has gone to great lengths to create.

---

**14.** Haddock's contention that the $10,000 loan is a wash because he, the borrower, owns 100% of First Finance, the lender, does not affect our determination of materiality. We will not dis-

The Bank of White City agrees to make a *downpayment of $250,000* to First Finance, Inc. this April 3, 1987 *for the exclusive rights to purchase* all or any part of a group of loans being purchased from FDIC from the failed Easton State Bank. Any loans purchased by The Bank of White City will first be offset against these downpayment dollars. Any remaining downpayment dollars after 90 days will be totally refunded.

(Emphasis added.) Patricia Fells, an officer at the Bank of White City, testified that she understood from the notation on the check and the language in the commitment letter that Haddock was to use the $250,-000 to purchase loans from the failed Easton State Bank. The government then introduced evidence, based on the investigations of FDIC examiner Byron Lange and his assistants, that Haddock used the $250,000 to fund a capital injection into the Bank of Herington and to partially fund the purchase of a personal residence. Despite Haddock's contentions that there was evidence to the contrary, we conclude that the proof introduced by the government was sufficient such that a reasonable jury could have found that Haddock defrauded the bank by applying the $250,000 in a way that was contrary to an agreement between the bank and First Finance, thereby violating 18 U.S.C. § 1344.

### Count 5

█ Count 5 charges Haddock with executing a scheme or artifice to obtain the moneys or funds of the Bank of White City by means of false or fraudulent pretenses, representations or promises in violation of 18 U.S.C. § 1344. The count alleges that Haddock executed this scheme by representing that the Bank of White City would have exclusive rights to purchase loans from the failed Easton State Bank. Undisputed evidence at trial shows that the Bank of White City gave Haddock (representing First Finance) $350,000 as another downpayment for exclusive rights to purchase the Easton loans.

With regard to Count 5, Haddock likewise argues that the arrangement with the Bank of White City did not prohibit First Finance from using the $350,000 in any way it chose. The government introduced evidence that a commitment letter accompanied the $350,000 cashier's check and that the letter contained language identical to language quoted above in relation to the letter accompanying the $250,000 downpayment. The government also introduced evidence that, prior to advancement of the $350,000, Haddock (and First Finance) had already pledged all of the Easton loans as collateral for a $711,000 loan from Kaw Valley State Bank. Moreover, Patricia Fells testified that she and others from the Bank of White City understood that the Bank of White City would have exclusive rights to the Easton loans. She also testified that the Bank of White City would not have given the $350,000 to First Finance had she and others at the bank been informed that the loans were already pledged as collateral elsewhere. Based on this evidence, we conclude that a reasonable jury could have concluded that, in order to receive the $350,000, Haddock defrauded the Bank of White City by representing that the bank would have exclusive rights to the Easton loans.

### Count 9

█ Count 9 likewise charges Haddock with executing a scheme or artifice to obtain the moneys or funds of the Bank of White City by means of false or fraudulent pretenses, representations or promises in violation of 18 U.S.C. § 1344. The count alleges that although the actual purchase price for the Galena loan package was $70,-766.45, Haddock represented to the Bank of White City that the purchase price was $95,766.45.

At trial, Dave Farres, president of the Bank of White City, testified that he understood that the purchase price of the Galena loan package was $95,766.45. The government introduced into evidence an asset agreement between the Bank of White City and First Finance that reflected the $95,-766.45 purchase price. The government also introduced into evidence an asset agreement from the FDIC files that shows the actual purchase price to be $70,766.45;

testimony of FDIC examiner Byron Lange corroborated this purchase price.

Farres also testified that the Bank of White City issued both a $50,000 check and a $70,766.45 check (a total of $120,766.45) to First Finance so that First Finance could purchase the Galena loans. Farres testified that the bank agreed that the $25,000 difference between the $120,766.45 advanced by the bank and the $95,766.45 purchase price—as represented by Haddock—was to be a servicing fee to First Finance. Based on this evidence, we conclude that a reasonable jury could have concluded beyond a reasonable doubt that Haddock defrauded the Bank of White City by representing the purchase price to be $25,000 more than First Finance actually paid for the Galena loans.

## VII. Challenges to Sentencing

Haddock was sentenced to forty-two months' imprisonment on each of Counts 1–9 and to twenty-four months imprisonment on Count 10, all to be served concurrently. The conduct related to Counts 1–7 occurred prior to November 1, 1987, the effective date of the United States Sentencing Commission Guidelines (the "Guidelines"). The conduct related to Counts 8–10 occurred after that effective date. Therefore, the district court correctly separated sentencing for Guidelines offenses from sentencing for pre-Guideline offenses. On appeal, Haddock challenges the district court's calculation of total loss, which in turn determined the enhancement of his sentence under Counts 8–10.

The district court adopted the probation officer's offense level computation based on Guideline § 2B1.1 (larceny, embezzlement, and other forms of theft) for Count 8, Guideline § 2F1.1 (fraud and deceit) for Counts 9 and 10, and on Guideline § 3D1.2 (grouping of offenses involving substantially the same harm). In its application of Guideline § 2B1.1, the district court determined that the appropriate "loss" was $1,730,266, which resulted in an eleven level enhancement of the sentence for Count 8. In its application of Guideline § 2F1.1, the district court used the same loss amount, which resulted in a nine level enhancement of the sentence for Counts 9 and 10.

In arriving at the loss amount of $1,730,-266, the probation officer—and by adoption the district court—calculated the total amount of loans involved in each of the ten counts.[15] The presentence report relied on Guideline §§ 1B1.3(a)(2) & 3D1.2 to group the losses from all ten counts. Section 1B1.3(a)(2) provides that a specific offense characteristic—in this case the amount of loss—is determined "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." Section 3D1.2(d) provides that "[a]ll counts involving substantially the same harm shall be grouped together"; counts involve substantially the same harm "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss."

■ Haddock contends that by grouping the losses from Counts 1–7 (pre-Guideline offenses) with the losses from Counts 8–10 (post-Guideline offenses), the sentence enhancement arrived at by the district court for Counts 8–10 violates the Ex Post Facto Clause. We note that Haddock does not challenge that all counts involve substantially the same harm, nor does he dispute that the pre-Guideline offenses were part of the same course of conduct or common scheme as the post-Guideline offenses.

■ Haddock's ex post facto argument is without merit. The Ex Post Facto Clause prohibits " 'any statute which punishes as a crime, which was innocent when done; which makes more burdensome the

---

15. Paragraph 52 of the presentence report states,

> The loans advanced to First Finance, Inc., or FDIC, used to calculate the amount of loss in the counts of conviction include $250,000 (FFI) received on April 3, 1987; $711,000 (FFI) received on May 5, 1987; $350,000 (FFI) received on January 24, 1987; $273,500 (FDIC) received on October 29, 1987; $50,000 (FFI) received on December 9, 1987; and $95,766 (FDIC) received on December 11, 1990. The total amount utilized to determine loss was $1,730,266.

punishment for a crime, after its commission...." Collins v. Youngblood, — U.S. —, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990) (quoting Beazell v. Ohio, 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925)). The district court's consideration of losses associated with pre-Guideline crimes in arriving at the Guideline offense level for Counts 8, 9, and 10 does not violate any of these ex post facto prohibitions. Grouping the losses from pre-Guideline crimes with losses from post-Guideline crimes arguably makes more burdensome Haddock's punishment for his post-Guideline crimes. This punishment for post-Guideline offenses, however, is not being imposed retroactively. Counts 8, 9, and 10 relate to crimes that were committed after the effective date of the Guidelines. We conclude that the enhancement of a sentence for a later offense based on losses associated with crimes that were committed prior to the effective date of the Guidelines does not violate the Ex Post Facto Clause. United States v. Ykema, 887 F.2d 697, 700 (6th Cir.1989) (augmenting punishment for later offense based on criminal acts committed prior to the passage of the enhancement law does not violate Ex Post Facto Clause), cert. denied, 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990).

▮ Haddock also contends that the district court erred in calculating the amount of the "loss" caused by Haddock for purposes of enhancing his sentence level. In particular, he argues that the court should not have assumed that the loans involved in each count were "losses" regardless of whether Haddock actually caused or intended to cause a loss. Because we reverse Haddock's conviction on Count 8, we need not address the calculation of "loss" under Guideline § 2B1.1, but only whether the district court appropriately calculated the "loss" under Guideline § 2F1.1, the Guideline related to fraud and

deceit. The probation officer who prepared Haddock's presentence report relied on United States v. Johnson, 908 F.2d 396 (8th Cir.1990) for the proposition that the amount of loans, rather than actual loss to the lender, should be used to determine offense levels for bank fraud.

After the district court sentenced Haddock, this court decided United States v. Smith, 951 F.2d 1164 (10th Cir.1991), in which the defendant was convicted for acquiring loans from a federally insured institution by making fraudulent misrepresentations. In Smith, we relied on the commentaries to Guidelines §§ 2B1.1 and 2F1.1 and held that

> [t]he Guidelines increase a defendant's base offense level sentence for either actual or intended loss, whichever is greater. Where the fraud results in actual loss within the definition provided by the commentary to Guidelines § 2B1.1, that value will be considered for purposes of enhancement under section 2F1.1. Where there is no such loss, or where actual loss is less than the loss the defendant intended to inflict, intended or probable loss may be considered.

Id. at 1166 (footnotes and citations omitted).

In this case, the district court apparently did not attempt to determine whether any actual, intended or probable loss was caused by the defendant's conduct. Instead, loss was assumed to be the amount of the loans Haddock obtained because of his fraudulent conduct. After Smith, we must conclude that this assumption is not always correct. In summary, in light of our recent decision in Smith, we reverse the sentence and remand for resentencing consistent with this opinion.[16]

## CONCLUSION

Based on the foregoing, we AFFIRM Haddock's convictions on Counts 2–7, 9 and

---

**16.** It appears that the Guidelines may have guided the district court's discretion in sentencing the defendant for pre-Guideline offenses. The court clearly recognized that the Guidelines do not govern sentencing for the defendant's pre-Guideline offenses, and we find no error in the court's looking to the Guidelines for guidance.

See United States v. Stumpf, 938 F.2d 172, 175 (10th Cir.1991). We reverse the sentence for Counts 2–7 and remand for sentencing as to those counts, however, because the court's improper calculation of loss under Guideline § 2F1.1 may have guided the court's discretion in sentencing the defendant for Counts 2–7.

10. Haddock's convictions on Counts 1 and 8 are REVERSED, and we REMAND for new trial on those two counts of misapplication of bank funds. Finally, we REVERSE Haddock's sentence, and we REMAND for resentencing on Counts 2–7, 9 and 10.